**QWEST SERVICES CORPORATION and Qwest Corporation, Petitioners**

v.

**Andrew BLOOD, Carrie Blood, and Public Service Company of Colorado, d/b/a Xcel Energy, Respondents.**

No. 09SC534.

Supreme Court of Colorado,
En Banc.

May 23, 2011.

As Modified on Denial of Rehearing
June 20, 2011.*

---

1072

Gibson, Dunn, & Crutcher LLP, Gregory J. Kerwin, Robert C. Marshall, Frederick R. Yarger, Denver, Colorado, Treece, Alfrey, Musat & Bosworth, P.C., Thomas N. Alfrey, Robert J. Zavaglia, Jr., Denver, Colorado, Attorneys for Petitioners.

Fogel, Keating, Wagner, Polidori and Shafner, P.C., William L. Keating, Michael O'Brien Keating, Denver, Colorado, Hale Westfall, LLP, Richard A. Westfall, Peter J. Krumholz, Denver, Colorado, Attorneys for Respondents, Andrew Blood and Carrie Blood.

White and Steele, P.C., David J. Nowak, John Lebsack, Denver, Colorado, Attorneys for Respondent, Public Service Company of Colorado.

John W. Suthers, Attorney General, Daniel D. Domenico, Solicitor General, Megan Paris Rundlet, Assistant Attorney General, Denver, Colorado, Attorneys for Amicus Curiae State of Colorado.

Center for Constitutional Litigation, P.C., Andre Mura, Washington, D.C., Ogborn, Summerlin, & Ogborn LLC, Thomas D. Ne-

ville, Denver, Colorado, Attorneys for Amicus Curiae American Association for Justice.

Wheeler Trigg O'Donnell LLP, Malcolm E. Wheeler, Denver, Colorado, Mayer Brown LLP, Evan M. Tager, Washington D.C., Attorneys for Amicus Curiae Chamber of Commerce of the United States of America.

Ayd & Johnson, James D. Johnson, Denver, Colorado, Attorneys for Amicus Curiae Colorado Defense Lawyers Association.

Justice MARTINEZ delivered the Opinion of the Court.

Petitioner Qwest Services Corporation ("Qwest") was found negligent for failing to maintain a utility pole that collapsed while respondent Andrew Blood was climbing it as part of his employment as a lineman with respondent/third-party defendant Public Service Company of Colorado, doing business as Xcel Energy ("Xcel"). The jury determined that Qwest was 100% at fault for Blood's injuries and awarded $9,917,600 for economic damages, $10,000,000 for physical impairments and disfigurement, $1,000,000 for non-economic damages, and $750,000 for loss of consortium. The jury further awarded $18,000,000 in exemplary damages after finding that Qwest acted willfully and wantonly in failing to maintain the pole and by failing to have a periodic inspection program that would have detected the pole's dangerous condition. Upon review, the court of appeals upheld the majority of the award in the published opinion of *Blood v. Qwest Services Corporation*, 224 P.3d 301 (Colo.App.2009). Qwest sought certiorari review in this Court seeking a new trial on all issues and a reversal of the judgments in favor of Blood and Xcel.

We granted certiorari on two issues related to the award of exemplary damages.[1] We hold that the U.S. Supreme Court's decision

in *Philip Morris USA v. Williams*, 549 U.S. 346, 127 S.Ct. 1057, 166 L.Ed.2d 940 (2007), does not support Qwest's facial challenge to section 13–21–102(1), C.R.S. (2010). Qwest's as-applied challenge to section 13–21–102(1) also fails because the trial court's instruction to the jury to disregard post-accident evidence in assessing exemplary damages was sufficient to comply with *Philip Morris*.

We also conclude, on de novo review, that the evidence is sufficient to demonstrate that Qwest's failure to implement a periodic pole inspection program was "willful and wanton" beyond a reasonable doubt and thereby satisfies the requirements for an exemplary damages award under section 13–21–102(1)(a).

Finally, we hold that the jury's $18 million exemplary damages award is within a constitutionally permissible range which is not "grossly excessive." After conducting a de novo review of the record and analyzing the three guideposts announced in *BMW of North America v. Gore*, 517 U.S. 559, 575, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996), we conclude that Qwest's failure to implement a periodic pole inspection program was sufficiently reprehensible to justify an exemplary damages award slightly less than compensatory damages.

## I. Facts and Procedure

Andrew Blood, a lineman employed by Public Service Company of Colorado, doing business as Xcel Energy ("Xcel"), suffered severe and permanent injuries while working on wood utility pole numbered P5905 owned by Qwest Services Corporation ("Qwest"). P5905 was installed in 1958.[2] In 1960, Qwest and Xcel entered into a Joint Use Contract ("JUC") that allowed Xcel to use Qwest's poles. In 2004, Union Pacific's operations required that P5905 be moved from the rail-

---

1. We granted certiorari on the following two issues:
 1. Whether the punitive damages award against Qwest violates the Due Process Clauses of the federal and Colorado constitutions as interpreted in *Philip Morris USA v. Williams*, 549 U.S. 346, 127 S.Ct. 1057, 166 L.Ed.2d 940 (2007).
 2. Whether the court of appeals erred in affirming the punitive damages award against

Qwest on de novo review, applying due process principles and Colorado requirements for willful and wanton conduct.

2. P5905 was a good-sized pole. It was approximately 50–feet long and had a Class 3 diameter where Class 1 is the strongest diameter and Class 7 is the weakest. Made from a lodgepole pine, P5905 was treated with pentachlorophenol in 1957.

road's right of way. Xcel developed and executed a plan to relocate P5905.

Three weeks before Blood's injury, an Xcel crew removed P5905's high voltage lines using a bucket truck. Two weeks later, Qwest removed the phone cable and sole supporting guy line from P5905. On June 29, 2004, Xcel assigned Blood to remove its attachments from P5905. Blood visually inspected P5905, and determined that it was well-placed in the ground. Blood also sound-tested P5905 by striking it numerous times with a heavy hammer to detect internal rot. He believed the pole was solid enough to climb, a belief shared by other experienced Xcel lineman on the scene. Thus, rather than using a bucket truck, Blood climbed the pole and started removing Xcel's attachments. As he was removing the last crossarm, P5905 broke, carrying Blood to the ground.

Due to the force of the fall, Blood suffered a burst fracture of his T–12 and L–1 vertebrae, a forward dislocation of his T–11 vertebra on his T–12 vertebra, a broken pelvis and a fractured right femur. Even though surgeons at Saint Anthony's Central, a level one trauma center in Denver, were able to stabilize and realign Blood's spinal column, he was rendered a T12 paraplegic from the waist down. As a result, he has impaired motor skills and sensory functions in his legs, a neurogenic bladder, limited bowel function, sexual and reproductive dysfunction, and impaired cognitive function due to the medications that are necessary to alleviate the chronic neuropathic pain that often results from a spinal injury.

### A. The Complaints

Blood sued Qwest for negligence, claiming that the accident was attributable to Qwest's failure to adopt a periodic pole inspection, maintenance, and repair program that would have discovered P5905's decay prior to Blood's accident. Blood's wife, Carrie, also sued Qwest for loss of consortium. Blood later amended his complaint to request exemplary damages based on Qwest's knowledge that its poles would rot over time and endanger linemen and the public.

Qwest brought a third-party complaint against Xcel seeking, among other things, contractual indemnity under the JUC. Article XII of the JUC provided that each party was responsible for injuries to its employees arising from a jointly used pole where the injuries were caused by the concurrent negligence of the parties or could not be traced to the sole negligence of the other party. Qwest argued that Xcel was negligent in failing to properly train its employee Blood and should have to pay for all of his damages pursuant to Article XII.

Xcel, in turn, raised the affirmative defense that Qwest could not enforce the liability-shifting provisions in Article XII of the JUC because it failed to perform a material term of the contract, namely to implement a periodic pole inspection program. In response to this affirmative defense, Qwest presented two arguments. First, Qwest argued that a periodic pole inspection program was not a material term of the JUC as demonstrated by the fact that Xcel had abandoned its own inspection program in 1995. Hence, Qwest argued that its failure to implement a periodic pole inspection program did not constitute a breach of the JUC. In the alternative, Qwest argued that Xcel had waived its right to declare a breach of the JUC due to the fact that Xcel continued to perform the JUC after Blood's accident despite knowing that Qwest still did not have a periodic pole inspection program in place. Qwest did not seek to bifurcate its contract claim against Xcel from Blood's negligence claim.

### B. Periodic Pole Inspection Program

There was extensive evidence in the record about the type of periodic pole inspection program that should have been in place to detect the rot that caused P5905's failure. The JUC mentioned the Edison Electric Institute manual (the "manual") and the National Electrical Safety Code ("NESC") as "accepted modern methods" for inspecting, maintaining, and repairing poles. The 1959 edition of the manual recommends that the first inspection of a wooden pole be conducted 24 years after the pole is installed, followed by periodic inspections every 12 years. Similarly, the NESC has specific safety requirements regarding residual strength and

requires a periodic inspection program with appropriate documentation.

Qwest's resident pole safety expert, Edwin Dauenhauer, agreed that if a pole is not periodically inspected, it can develop below ground internal rot and eventually collapse, causing property damage, serious injury or even death. He thus agreed that Qwest had an obligation—independent of any contract— to maintain its poles in a safe condition. Moreover, he conceded that the only way to detect below ground internal rot was with a periodic pole inspection program that includes ground-line inspections and bore-hole samples.

Testimony at trial indicated that a periodic pole inspection program would have detected P5905's internal rot. Under such a program, P5905 would have been inspected around 1979–1982 and again around 1990–1994. Both parties' experts agreed that such periodic inspections, which would have included the necessary below ground bore samples, would have detected P5905's decay and structural instability, likely averting Blood's accident.

Nonetheless, despite the known safety threat of collapsing poles, Qwest possessed no evidence demonstrating that it had ever inspected P5905 during the 46 years prior to Blood's accident. Qwest did enter into a contract in 1980 with a third party to conduct sampling of its poles and determine the condition of the poles in the Denver area. However, Qwest canceled that contract three weeks later.

At the start of trial, three years after Blood's accident, Qwest still had not implemented a periodic pole inspection program. Qwest justified this conduct on the grounds that it relied on pre-climb inspections by linemen to detect internal rot. Moreover, Qwest claimed that it would replace those poles that lineman found unsafe. Finally, Qwest emphasized that there had not been any incidents, prior to Blood's accident, where a pole had actually injured a member of the public, another pole-climber, or anyone else.

## C. Qwest's Motion In Limine

Qwest filed a pre-trial motion in limine asking the trial court to exclude any evidence or argument (1) that Qwest had not implemented a pole inspection program since the accident, and (2) that the lack of such an inspection program posed a risk of harm to nonparties. Qwest first argued that its lack of a post-accident inspection program was completely irrelevant under Colorado Rules of Evidence 401, 402, and 403. Qwest also argued that evidence or argument on this issue would run afoul of the Due Process Clause and the U.S. Supreme Court's decision in *Philip Morris* because the evidence could invite the jury to award exemplary damages to punish Qwest for the risk of future harm to non-parties. The trial court granted the motion.

At the start of trial, Blood and Xcel asked the court to reconsider the motion in limine. Blood's counsel clarified that *Philip Morris* dealt with the jury's use of evidence or argument of harm to nonparties when assessing exemplary damages, not the admissibility of that evidence or argument. Thus, Blood's counsel argued, to the extent the trial court relied on *Philip Morris* to exclude evidence or argument regarding Qwest's lack of a post-accident inspection program, it was mistaken. Moreover, Blood's counsel promised that he would not violate *Philip Morris* by asking the jury to punish Qwest for harm to nonparties. Finally, Blood's counsel explained that Qwest's post-accident practices were relevant to prove Qwest's state of mind and, more specifically, the willful and wanton nature of its conduct as required for an award of exemplary damages under section 13–21–102. Blood thus asked the court to either reverse or, at the very least, clarify its motion in limine. Qwest responded that evidence or argument regarding its post-accident inspection practices would only prejudice the jury.

After reviewing *Philip Morris*, the trial court denied the motion to reconsider, explaining that subsequent remedial measures are generally not admissible. The court noted that there would be evidence regarding Qwest's failure to implement a periodic inspection program for the 46 years prior to

the accident. Accordingly, the court concluded that evidence or argument regarding Qwest's failure to implement a periodic pole inspection program during the three years after the accident was irrelevant and more prejudicial than probative. The court thus reaffirmed its prior ruling granting the motion in limine.

The trial court later modified its ruling on the motion in limine on the grounds that Qwest had opened the door to post-accident inspection practices. While examining its own Director of Process Management, Mark Schmidt, Qwest asked questions regarding the JUC and Qwest's net payments on the contract both before and after Blood's accident. Specifically, Qwest asked Schmidt whether Qwest had substantially performed the JUC by making all of its payments for its use of Xcel's poles before and after the accident. Schmidt replied that Qwest had made all of its payments in compliance with the JUC.

In response to this questioning, Blood and Xcel argued that Qwest had opened the door regarding Qwest's post-accident performance on the JUC. Blood therefore requested the opportunity to ask Schmidt a question clarifying that Qwest had not in fact complied with the JUC due to its failure to implement a periodic pole inspection program after the accident. The trial court ruled that Qwest had opened the door and thus permitted one follow-up question regarding Qwest's lack of a post-accident pole inspection program. Blood thus asked Schmidt one question regarding whether Qwest had implemented a periodic pole inspection program since the accident. Schmidt replied no.

Qwest called as its final witness Xcel employee James Downie and asked him numerous questions regarding Xcel's performance on the JUC after the accident. At least ten of Qwest's questions emphasized the fact that Xcel had not resumed its periodic pole inspection program since the accident. Qwest concluded its examination of Downie by asking him whether Xcel knew if Qwest had also failed to implement a periodic pole inspection program since Blood's accident. Downie responded that even though Xcel had learned that Qwest still did not have a periodic in-

spection program in place, it nonetheless continued to perform on the JUC.

### D. Closing Arguments

At closing argument, Qwest relied on Downie's testimony for two propositions regarding its indemnity claim under the JUC. First, Qwest argued to the jury that periodically inspecting poles was not a material term of the JUC. After all, neither Xcel nor Qwest had such a program in place since the accident. In fact, Qwest emphasized that "even Xcel abandoned inspection of poles in 1995. It is 12 years later … and they have not been performing this obligation.… It must not have been material to [Xcel]." Second, even though Xcel knew that Qwest had failed to implement such an inspection program, it continued to perform on the contract. Xcel had, therefore, waived its right to declare a breach of the JUC due to Qwest's lack of a pole inspection program. Accordingly, pursuant to the liability-shifting provisions in Article XII, Qwest asked the jury to hold Xcel responsible for the costs associated with Blood's injuries.

Blood's closing argument also emphasized Qwest's lack of a pole inspection program, albeit for a different reason. First, Blood noted that Qwest did not periodically inspect, maintain, or repair any of its 157,000 poles despite knowing that some of these poles would inevitably fail due to internal rot. As a result, Qwest had not inspected P5905 for the 46–years prior to Blood's accident. Blood also argued that Qwest's failure to implement a periodic inspection program, even after Blood's accident, demonstrated the willful and wanton nature of its conduct. Finally, Blood asked the jury to send a message to Qwest with a punitive damages verdict. Ideally, Blood explained, a verdict could lead to some good—"the poles get repaired, the poles get replaced, there is not another Andy Blood."

Qwest immediately brought a motion for mistrial on the grounds that Blood had violated the motion in limine by discussing post-accident inspection practices. Again, Qwest argued that its lack of a post-accident inspection program was irrelevant and prejudicial. Qwest did not, however, request a protective

instruction explaining to the jury the distinction between determining reprehensibility based on harm to nonparties and directly punishing a defendant for harm to nonparties. *See Philip Morris*, 549 U.S. at 350–51, 127 S.Ct. 1057.

The trial court denied the motion for mistrial on the grounds that Qwest had opened the door, making its lack of an inspection program relevant to the contract issues between Qwest and Xcel. The court then orally instructed the jury that "the only conduct that can be considered in relation to the punitive damages is the conduct prior to the date of the accident, that is prior to June 29th, 2004, that is the law." The jury was therefore expressly forbidden from considering Qwest's lack of a post-accident pole inspection program for any purpose when assessing exemplary damages.

In rebuttal closing, Blood expressly confined his argument to the period prior to the accident. He argued that Qwest failed to inspect poles up "until June 29th, 2004 when decades of neglect, intentional neglect caught up with pole 5909 and it fell and then it hurt Andy Blood." He further explained that the accident was the result of Qwest's "40 years of failing to inspect poles" and "that Qwest had no idea prior to June 29th how many of its poles were defective."

The jury was then provided with written instructions. Pursuant to section 13–21–102(1)(b), one written instruction stated that the jury could only award exemplary damages if Qwest acted in a "willful and wanton manner," defined as conduct "purposefully committed by a person who must have realized that the conduct was dangerous, and which conduct was done heedlessly and recklessly, either without regard to the consequences, or without regard to the rights and safety of others, particularly the plaintiff."

After deliberation, the jury found that Qwest was negligent and 100% at fault. It

awarded $9,917,600 in economic losses, $1,000,000 in noneconomic losses, $10,000,000 for physical impairment and disfigurement, $750,000 for loss of consortium, and $18,000,000 in exemplary damages. The jury also found that Qwest had breached the JUC and returned a verdict in favor of Xcel on its JUC counterclaim.

Blood then moved to increase exemplary damages under section 13–21–102(3)(a), C.R.S. (2010), because Qwest had not implemented a periodic pole inspection program between the date of the filing of the action and the trial. Section 13–21–102(3)(a) instructs a trial court that it "may increase any award of exemplary damages ... if it is shown that [t]he defendant has continued the behavior or repeated the action which is subject of the claim against the defendant in a willful and wanton manner[.]" Without holding a hearing, the trial court trebled the punitive damages award based on the statutory criteria and Qwest's continuing conduct after the accident.[3] Qwest appealed.

### E. Court of Appeal's Ruling

On appeal, Qwest argued, among other things, that subsection 13–21–102(1)(b) is unconstitutional, both facially and as applied, because it allows a jury to award punitive damages to punish a defendant for actual or potential harm to a non-party in violation of the due process limitations announced in *Philip Morris*. Qwest also argued that the punitive damages award should be reversed because the evidence is insufficient to establish, beyond a reasonable doubt, that its conduct was "willful and wanton" as required by section 13–21–102(1)(a) for an exemplary damages award. Qwest further argued that the punitive damages award should be reversed as excessive and disproportionate, in violation of due process under *Gore*, 517 U.S. 559, 116 S.Ct. 1589. Finally, Qwest contended that the trial court erred by denying its

---

**3.** Before the court of appeals, Qwest challenged the order trebling damages on the grounds that it was entitled to an evidentiary hearing. The court of appeals noted that "Qwest did not and indeed could not dispute the predicate for Blood's motion: failure to implement a periodic pole inspection program between the filing date and the trial." *Blood*, 224 P.3d at 319. None-

theless, the court of appeals agreed that Qwest was entitled to a hearing regarding whether its failure to implement a pole inspection program was "willful and wanton" and thus warranted treble damages. *Id.* Accordingly, the court of appeals vacated the order trebling damages. *Id.* Neither Qwest nor Blood has appealed this aspect of the court of appeals' ruling.

motion for a mistrial following Blood's closing argument.

The majority of the court of appeals dismissed Qwest's facial and as-applied constitutional challenges to section 13–21–102(1). The majority also found that the evidence was sufficient to support an award for exemplary damages under Colorado law. Moreover, after conducting a de novo review of the record, the majority concluded that the jury's $18 million exemplary damages award was within the constitutionally permissive range required by due process. Finally, the majority concluded that the trial court's denial of Qwest's mistrial motion was not an abuse of discretion. The majority noted that Blood's closing argument "was consistent with the [trial] court's ruling near the end of evidence presentation that Qwest had opened the door to its post-accident conduct by offering testimony about its ongoing contractual relationship with Xcel." *Blood,* 224 P.3d at 321.[4]

Even though the dissent agreed that section 13–21–102(1) was neither unconstitutional on its face nor as applied, it would have vacated the jury's exemplary damages award on the grounds that it was "grossly excessive." The dissent further argued that evidence of post-accident conduct must have tainted the jury's award, despite the trial court's limiting instruction.

We granted certiorari on two issues related to the award of exemplary damages.

## II. Constitutionality of Subsection 13–21–102

■ In Colorado, exemplary damages are only available by statute. *See Corbetta v. Albertson's, Inc.,* 975 P.2d 718, 721 (Colo. 1999). Before a jury may impose exemplary damages, it must determine that the "injury complained of" was "attended by circumstances of fraud, malice, or willful and wanton conduct," § 13–21–102(1)(a), which must be proved beyond a reasonable doubt, § 13–25–127(2), C.R.S. (2010). Willful and wanton conduct is defined as

conduct purposefully committed which the actor must have realized as dangerous, done heedlessly and recklessly, without regard to consequences, or of the rights and safety of others, particularly the plaintiff.

§ 13–21–102(1)(b).

Qwest contends that Colorado's exemplary damages statute is unconstitutional, both facially and as-applied, because subsection 13–21–102(1)(b)'s definition of willful and wanton conduct allows juries to consider harm to nonparties-namely the "rights and safety of others, particularly the plaintiff"-in violation of the due process limitation on exemplary damages announced in *Philip Morris.* Because Qwest relies heavily on *Philip Morris* to support its facial and as-applied challenges to the statute, we review that opinion in some detail.

### A. *Philip Morris USA v. Williams*

In *Philip Morris,* the U.S. Supreme Court provided substantial guidance and clarification regarding the limited manner in which a jury may consider harm to nonparties in assessing punitive damages. 549 U.S. 346, 127 S.Ct. 1057, 166 L.Ed.2d 940. The case arose out of the death of Jesse Williams, a heavy cigarette smoker. *Id.* at 349, 127 S.Ct. 1057. His widow brought a negligence and deceit lawsuit against Philip Morris, the manufacturer of Marlboro—the brand her husband favored. *Id.* She sought, among other things, compensatory damages as well as exemplary damages under Oregon's exemplary damages statute. *Id.* at 350, 127 S.Ct. 1057.

At closing argument, the plaintiff's attorney told the jury to "think about how many other Jesse Williams in the last 40 years in the State of Oregon there have been ... [C]igarettes ... are going to kill ten [of every hundred]. [And] the market share of Marlboros [i.e., Philip Morris] is one-third [i.e., one of every three killed]." *Id.* In response to this argument, Philip Morris requested that the judge instruct the jury:

4. Qwest did not seek certiorari review of the court of appeals' decision that the trial court did not abuse its discretion in denying the motion for mistrial. *See Bloom v. People,* 185 P.3d 797, 807

(Colo.2008) (trial court's denial of a motion for mistrial will not be disturbed absent an abuse of discretion).

'you may consider the extent of harm suffered by others in determining what [the] reasonable relationship is' between any punitive award and the harm caused to Jesse Williams' by Philip Morris' misconduct, [but] you are not to punish the defendant for the impact of its alleged misconduct on other persons, who may bring lawsuits on their own in which other juries can resolve their claims....'

*Id.* at 350–51, 127 S.Ct. 1057. The judge refused to tender Philip Morris' requested limited-purpose jury instruction, and instead instructed the jury that "[p]unitive damages are awarded against a defendant to punish misconduct and to deter misconduct' and are not intended to compensate the plaintiff or anyone else for damages caused by the defendant's conduct.' " *Id.* at 351, 127 S.Ct. 1057. Ultimately, the jury found Philip Morris liable and awarded the plaintiff $821,000 in compensatory damages along with $79.5 million in punitive damages. *Id.* at 350, 127 S.Ct. 1057. The U.S. Supreme Court reversed.

The Court emphasized that the "Due Process Clause forbids a State to use a punitive damages award to punish a defendant for injury that it inflicts upon non-parties or those whom they directly represent, i.e., injury that it inflicts upon those who are, essentially strangers to the litigation." *Id.* at 353, 127 S.Ct. 1057. The Court identified three constitutional reasons for limiting a defendant's liability for harm to non-parties. First, permitting the jury to punish a defendant for harm to nonparties would deprive that defendant of " 'an opportunity to present every available defense.' " *Id.* (quoting *Lindsey v. Normet,* 405 U.S. 56, 66, 92 S.Ct. 862, 31 L.Ed.2d 36 (1972)). Second, "to permit punishment for injuring a non-party victim would add a near standardless dimension to the punitive damages equation," thereby implicating fundamental due process concerns. *Id.* at 354, 127 S.Ct. 1057 (citing *State Farm Mut. Auto. Ins. Co. v. Campbell,* 538 U.S. 408, 416, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003) and *Gore,* 517 U.S. at 574, 116 S.Ct. 1589). Finally, the Court found no authority permitting the use of punitive damages to punish a defendant for harm to nonparties. *Id.* Based on these three reasons,

the Court concluded that a jury may not "use a punitive damages verdict to punish a defendant directly on account of harms it is alleged to have visited on nonparties." *Id.* at 355, 127 S.Ct. 1057.

The Court was, however, quick to clarify that its holding did not disturb the well-established view that a plaintiff is entitled to present evidence of harm to nonparties. "Evidence of actual harm to nonparties can help to show that the conduct that harmed the plaintiff also posed a substantial risk of harm to the general public, and so was particularly reprehensible...." *Id.* That is, evidence of harm to non-parties is relevant to demonstrate the "reprehensibility" of the defendant's actions, "a different part of the punitive damages constitutional equation[.]" *Id.* Thus, while *Philip Morris* restricts a defendant's liability for being punished for harm to non-parties, it does not necessarily limit the admissibility of evidence of harm to non-parties. *See Pedroza v. Lomas Auto Mall, Inc.,* 2009 WL 1300944, *4 (D.N.M. Apr. 2, 2009).

The Court then held that when the evidence or argument presented raises a "significant" risk that the jury will seek to punish the defendant for causing harm to non-parties, "a court, upon request, must protect against that risk." *Philip Morris,* 549 U.S. at 357, 127 S.Ct. 1057. Given that Philip Morris had requested a jury instruction to limit the jury's consideration of evidence of harm to nonparties, the implication of the Court's holding is that a similar limited-purpose jury instruction, provided upon request, would be sufficient to satisfy the procedural requirements of the Due Process Clause.

Ultimately, the Court remanded the case so that the Oregon Supreme Court could apply the Due Process standard articulated in the opinion. *Id.* at 357–58, 127 S.Ct. 1057. The Court did not demand a new trial or a change in the level of the punitive damages award. *Id.* at 358, 127 S.Ct. 1057. With *Philip Morris* as our guide, we now turn to Qwest's facial and as-applied challenges to subsection 13–21–102(1)(b).

## B. Facial Challenge

■ Statutes are presumed to conform to constitutional standards, and a party challenging the constitutionality of a statute bears the burden of proving the invalidity of a statute beyond a reasonable doubt. *People v. Zinn*, 843 P.2d 1351, 1353 (Colo.1993). Thus, for its facial challenge to succeed, Qwest must prove beyond a reasonable doubt that it is impossible to apply subsection 13–21–102(1)(b) in a constitutional manner. *See People v. Montour*, 157 P.3d 489, 499 (Colo. 2007); *see also Dallman v. Ritter*, 225 P.3d 610, 625 (Colo.2010) ("A facial challenge can only succeed if the complaining party can show that the law is unconstitutional in all its applications.") (citing *United States v. Salerno*, 481 U.S. 739, 745, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987)). To meet this burden, Qwest relies heavily on *Philip Morris* for the proposition that subsection 13–21–102(1)(b) is unconstitutional on its face because it permits juries to consider non-party harm—specifically the "rights and safety of others"—when awarding punitive damages. Qwest also contends that the statute violates *Philip Morris* because it lacks any linguistic or procedural limitations that could cabin the jury's consideration of actual or potential harm to others to the limited task of assessing reprehensibility. We do not read *Philip Morris* as broadly and thus reject both of these facial challenges.

### 1.

As an initial matter, there is no suggestion in the statute that a jury could or should award exemplary damages to punish a defendant for harm to non-parties. *Philip Morris* emphasized that the Due Process Clause prohibits a "punitive damages award to *punish* a defendant for injury that it inflicts upon non-parties, i.e., injury that it inflicts upon those who are, essentially, strangers to the litigation." 549 U.S. at 353, 127 S.Ct. 1057 (emphasis added). Subsection 13–21–102(1)(a) does not, however, contain the offending

terms "punish" or "punishment," let alone suggest that a jury should award exemplary damages to punish a defendant for injury it inflicts upon non-parties.[5] Rather, the statute permissively states that the jury "may" award exemplary damages where the circumstances attending the "wrong done the person" demonstrate "fraud, malice or willful and wanton conduct[.]" *See* § 13–21–102(1)(a). On its face then, subsection 13–21–102(1)(a) does not implicate the central concern in *Philip Morris*—namely that a jury might "use a punitive damages verdict to punish a defendant directly on account of harms it is alleged to have visited on nonparties." 549 U.S. at 355, 127 S.Ct. 1057.

■ Instead, subsection 13–21–102(1)(b) of the statute complies with the holding in *Philip Morris* to the extent it permits the jury to consider the "rights and safety of others" in assessing the willful and wanton nature (i.e. the reprehensibility) of the defendant's conduct. In *Philip Morris*, the U.S. Supreme Court explained that a jury may consider harm to nonparties when gauging the "reprehensibility" of the defendant's actions. *Id.* at 357, 127 S.Ct. 1057 ("[W]e recognize that conduct that risks harm to many is likely more reprehensible than conduct that risks harm to only a few. And a jury consequently may take this fact into account in determining reprehensibility."). This holding built upon the Court's prior decision in *State Farm* which directed trial courts to consider whether the defendant's conduct evinced "reckless disregard of the health or safety of others" when assessing the reprehensibility of a defendant. 538 U.S. at 419, 123 S.Ct. 1513. Here, the statute cabins the jury's consideration of a defendant's disregard for "the rights and safety of others" to the narrow task of gauging "willful and wanton conduct." *See* § 13–21–102(1)(b). By listing harm to nonparties as a factor in assessing reprehensibility, the statute complies with the due process limitations on exemplary damages set forth in both *Phil-*

---

5. In this respect, Colorado's exemplary damages statute is distinct from other state exemplary damages statutes that explicitly direct a jury to punish the defendant for harm to nonparties. *See e.g.*, Okla. Stat. Ann. tit. 23, § 9.1 (West) ("the jury, in addition to actual damages, may,

... award punitive damages for the sake of example and by way of *punishing* the defendant based upon the following factors: 1. The seriousness of the *hazard to the public* arising from the defendant's misconduct ...." (emphasis added)).

ip Morris and *State Farm. See e.g., Grefer v. Alpha Technical,* 965 So.2d 511, 517 (La.App. 4th Cir.2007). Thus, because the statute permits a jury to consider harm to nonparties only for the purpose of assessing whether the defendant's conduct is willful and wanton, it is not unconstitutional.[6]

**2.**

Qwest also argues that the statute is unconstitutional on its face because it lacks legislatively-prescribed procedural safeguards. While subsection 13–21–102(1)(b) permits juries to consider the "rights and safety of others" in determining whether there was "willful and wanton conduct," Qwest claims that the statute does not expressly limit a jury's consideration of nonparty harm to the task of assessing reprehensibility.

Again, Qwest overlooks the context and limited nature of the holding in *Philip Morris.* To be clear, *Philip Morris* arose in the context of a requested limited-purpose jury instruction. The Court explained that "it is constitutionally important for a court to provide assurance that the jury will ask the right questions, not the wrong ones." *Philip Morris,* 549 U.S. at 355, 127 S.Ct. 1057. The Court thus held that "a court, upon request,

must protect against [the] risk" that the jury will punish the defendant for harm to nonparties. *Id.* at 357, 127 S.Ct. 1057. The focus of the case was court-ordered protection—namely the jury instruction Philip Morris requested at trial—not specific language in Oregon's exemplary damages statute. As a result of this focus, nothing in the opinion suggests that a state's exemplary damage statute must expressly limit a jury's use of nonparty harm. In fact, reading such a statutory requirement into *Philip Morris* is nonsensical given that it would lead to a sweeping invalidation of numerous state exemplary damages statutes that reference harm to nonparties.[7]

In addition, section 13–21–102(1) as a whole provides sufficient legislatively-prescribed procedural safeguards. As the Court established in *Philip Morris,* the Due Process clause requires "some form of protection in appropriate cases." 549 U.S. at 357, 127 S.Ct. 1057. The structure of section 13–21–102(1) satisfies this standard by limiting the jury's consideration of harm to nonparties to the permissible task of assessing the willful and wanton nature of the defendant's conduct.

First, subsection 13–21–102(1)(a) starts out by limiting exemplary damages to "all civil

---

**6.** Qwest's proposed remedy to subsection 13–21–102(1)(b) underscores its erroneous interpretation of *Philip Morris.* To adopt a constitutional interpretation of the current statute, Qwest argues that this court must edit subsection 13–21–102(1)(b) to exclude any reference to the "health or safety of others" from the definition of willful and wanton conduct. This proposed remedy would effectively prevent a jury from ever considering harm to others, an outcome that would greatly expand, if not contradict, the holdings in *Philip Morris* and *State Farm* that permit the jury's consideration of such evidence when assessing the reprehensibility of the defendant's conduct.

**7.** Numerous state exemplary damages statutes permit the jury to consider whether a defendant's conduct endangered the health, rights or safety of others. *See e.g.,* Ala.Code § 6–11–20(b)(3) (West) ("rights or safety of others"); Cal. Civ. Code § 3294(c)(1) (West) ("rights or safety of others"); Fla. Stat. Ann. § 768.72 (West) ("life, safety, or rights of persons exposed to such conduct"); Minn.Stat. Ann. § 549.20 (West) ("rights or safety of others"); Miss.Code. Ann. § 11–1–65 (West) ("the safety of others"); Nev.Rev.Stat.

Ann. § 42.001 (West) ("rights or safety of others"); N.C. Gen. Stat. Ann. § 1D–5 (West) ("rights and safety of others"); Okla. Stat. Ann. tit. 23, § 9.1 (West) ("the hazard to the public"); Or.Rev.Stat. Ann. § 31.730 (West) ("health, safety and welfare of others"); Utah Code Ann. § 78B–8–201 (West) ("the rights of others"). If *Philip Morris* required legislatively-prescribed procedural safeguards, all of these state statutes would arguably be constitutionally infirm because they fail to expressly limit a jury's consideration of harm to others to the reprehensibility analysis. Due to the absence of any discussion in *Philip Morris* requiring, let alone contemplating, such a sweeping outcome, we are disinclined to interpret the opinion to require legislatively-proscribed procedural safeguards. Instead, we are persuaded by the Court's statement that states have "some flexibility" in providing constitutionally required protection. *Philip Morris,* 549 U.S. at 357, 127 S.Ct. 1057. Given that the case was decided in the context of a limited-purpose jury instruction, we conclude that similar jury instructions are a constitutionally sufficient form of protection and hence there is no need to require rigid procedural protections in our exemplary damages statute.

actions in which damages are assessed by a jury for a wrong done to the person...." This subsection clearly states that exemplary damages are only available for the "injury complained of" or the "wrong done to the person." Thus, by tying exemplary damages to the plaintiff's injuries, this subsection protects against the concern that the jury might use an exemplary damages award to punish the defendant for injuries to nonparties.

Subsection 13–21–102(1)(a) then requires the jury to make a finding that the "injury complained of" by the plaintiff was "attended by circumstances of fraud, malice, or willful and wanton conduct." Again, the statute ties the jury's consideration of willful and wanton conduct to the "injury complained of" by the plaintiff.

Finally, nested within subsection 13–21–102(1)(b) is the definition of "willful and wanton conduct." Even though this definition permits the jury to consider the "rights and safety of others, particularly the plaintiff," the structure of the statute limits the jury's consideration of harm to nonparties by tying the award of exemplary damages to the "wrong done to the person" and the "injury complained of" by the plaintiff. In this way, subsection 13–21–102(1)(a) prohibits the jury from punishing the defendant for injury to others. In fact, to the extent the statute permits the jury to consider the rights and safety of others, it focuses the jury's attention on "the rights and safety of others, *particularly the plaintiff.*" § 13–21–102(1)(b) (emphasis added). Thus, subsections 13–21–102(1)(a) and (b) together minimize the risk that the jury might use an exemplary damages award to punish the defendant directly for harm to nonparties. Although *Philip Morris* does not require legislatively prescribed procedural protection, we conclude that the statute provides protection that addresses the due process concerns discussed in *Philip Morris*.

■ Central to *Philip Morris*, however, was the jury instruction requested by the defense to clarify the fine distinction between the jury's legitimate and illegitimate consideration of harm to nonparties. Because subsections 13–21–102(1)(a) and (b) are not quite as clear as the requested jury instruction in

*Philip Morris,* we are not prepared to say that trial courts may forego a requested limited-purpose jury instruction and rely solely on the procedural protections built into subsections 13–21–102(1)(a) and (b). Instead, when the evidence or argument presented raises a "significant" risk that the jury will seek to punish the defendant for causing harm to non-parties, "a court, upon request, must protect against that risk." *Philip Morris,* 549 U.S. at 347, 127 S.Ct. 1057.

## C. As–Applied Challenge

■ For as-applied constitutional challenges, the question is whether the challenging party can establish that the statute is unconstitutional "under the circumstances in which the plaintiff has acted or proposes to act." ' *Developmental Pathways v. Ritter,* 178 P.3d 524, 534 (Colo.2008) (quoting *Sanger v. Dennis,* 148 P.3d 404, 410 (Colo.App. 2006)). In support of its as-applied challenge, Qwest again relies heavily on *Philip Morris.* This time, Qwest argues that the trial court failed to protect it from the risk that the jury would directly punish it for the potential harm to nonparties implied by its lack of a post-accident pole inspection program.

To be clear though, the trial court instructed the jury that the only evidence it could consider when awarding exemplary damages was Qwest's conduct prior to Blood's accident. The jury was thus forbidden from considering the potential harm to nonparties implied by Qwest's post-accident conduct when assessing exemplary damages. In this light, Qwest received a jury instruction that was sufficient to protect it against the risk that the jury would punish it for the potential harm to non-parties implied by its post-accident conduct in violation of *Philip Morris.* Qwest's as-applied challenge must, therefore, boil down to the argument that the jury refused to comply with the trial court's instruction and punished Qwest directly for the potential harm to non-parties implied by its lack of a post-accident inspection program.

Our analysis of Qwest's as-applied challenge begins with two threshold issues raised by Blood. We then turn to two issues raised

by Qwest regarding the sufficiency of the jury instruction and whether the jury complied with that instruction. Ultimately, we dismiss Qwest's as-applied challenge.

### 1.

As an initial matter, Blood argues that Qwest's reliance on *Philip Morris* for its as-applied challenge is baseless because there was no evidence of actual harm to nonparties.[8] This threshold argument turns on Blood's narrow view that *Philip Morris* only applies to cases involving evidence or argument of actual, not potential, harm to nonparties. As Blood correctly points out, the U.S. Supreme Court was particularly concerned that a jury would award punitive damages against a defendant as "punishment for its having *harmed* others." *Philip Morris,* 549 U.S. at 351, 127 S.Ct. 1057 (emphasis added). The Court thus held that a defendant, upon request, must be protected against the risk of being punished for "having caused injury to others[.]" *Id.* at 357, 127 S.Ct. 1057. Given these repeated references to actual harm caused to nonparties, Blood infers that the Court was not concerned with argument or evidence regarding potential harm to nonparties. Blood supports this narrow reading on the grounds that potential harm to nonparties, by its nature, goes to the reprehensibility of the defendant's conduct and thus may be considered by the jury pursuant to *Philip Morris* and *State Farm.*

■ We are unwilling to conclude that the Due Process Clause only requires courts to protect defendants from evidence or argument concerning actual harm to nonparties. *Philip Morris* suggests that the Due Process Clause also limits the jury's consideration of potential harm to nonparties when assessing exemplary damages. During the closing argument in *Philip Morris,* the plaintiff's attorney asked the jury to consider both actual

and potential future harm to nonparties caused ·by cigarettes.[9] 549 U.S. at 350, 127 S.Ct. 1057. The Court was thus presented with an appeal involving both actual and potential harm to nonparties. As a result, the Court's holding applies to both actual and potential harm alike.

Indeed, permitting the jury to punish a defendant for potential harm to nonparties implicates all three of the due process concerns announced in *Philip Morris.* *Id.* at 353–54, 127 S.Ct. 1057. In particular, permitting punishment for potential harm to nonparties, just like permitting punishment for actual harm to nonparties, could "add a near standardless dimension to the punitive damages equation." *Id.* at 354, 127 S.Ct. 1057.

The *Philip Morris* Court also explained that it may be appropriate to consider the reasonableness of a punitive damages award in light of the "harm potentially caused [to] *the plaintiff.*" *Id.* at 354, 127 S.Ct. 1057 (citing *State Farm,* 538 U.S. at 424, 123 S.Ct. 1513). The Court's emphasis in this statement implies that it could violate a defendant's due process rights if the jury considered harm potentially caused to *nonparties.* Accordingly, we conclude that the evidence and arguments in this case, even though limited to potential harm to nonparties, nonetheless could provide a basis for Qwest's as-applied challenge under *Philip Morris.*

### 2.

Blood also contends that Qwest waived its as-applied challenge by failing to request an instruction limiting the jury's consideration of harm to nonparties when assessing punitive damages. In response, Qwest argues that it actually requested the trial court's protection in a pre-trial motion in limine that cited *Philip Morris* and asked the court to forbid evidence or argument that Qwest's

---

**8.** According to Qwest, there was no evidence whatsoever of actual injury to other linemen or the public before or after Blood's injury. As such, the arguments in this case only dealt with the risk of harm to non-parties (i.e. potential harm), not actual harm to non-parties.

**9.** Specifically, the plaintiff's attorney asked the jury to consider how many smokers similar to the plaintiff had died in the last 40–years as well as the fact that "cigarettes ... are *going* to kill ten [of every hundred]." *Philip Morris,* 549 U.S. at 350, 127 S.Ct. 1057 (emphasis added). This closing argument thus implies potential future harm to non-parties.

post-accident lack of a routine pole inspection program poses a risk of harm to nonparties.

The court of appeals held that Qwest had waived its as-applied challenge. *Blood,* 224 P.3d at 313–14. First, the court of appeals emphasized that *Philip Morris* states only that a trial court must protect—"upon request"—against the risk of the jury "seeking, not simply to determine reprehensibility, but also to punish for harm caused strangers." *Id.* at 313 (quoting *Philip Morris,* 549 U.S. at 355, 357, 127 S.Ct. 1057). The court of appeals then refused to equate Qwest's

> in limine motion to exclude evidence or argument that post-accident lack of a routine pole inspection program poses a risk of harm to nonparties' with a limiting instruction distinguishing reprehensibility from punishment.

*Id.* Accordingly, the court of appeals concluded that Qwest had failed to request a *Philip Morris* limiting instruction and thus had waived its as-applied constitutional challenge to section 13–21–102(1)(b). *Id.* at 314.

■ We agree that *Philip Morris* requires only that a court provide a limited-purpose jury instruction "upon request." *See* 549 U.S. at 357, 127 S.Ct. 1057. First, as we have explained already, *Philip Morris* arose in the context of a requested instruction to limit the jury's consideration of harm to nonparties when assessing punitive damages. Accordingly, the Court held only that a court must provide such a limited-purpose jury instruction "upon request[.]" *Id.* Second, other courts have held that a defendant must request a jury instruction, similar to the one requested in *Philip Morris,* in order to preserve an as-applied challenge to an exemplary damages award. *See American Family Mut. Ins. Co. v. Miell,* 569 F.Supp.2d 841, 852–53 (N.D.Iowa 2008); *Kauffman v. Maxim Healthcare Services, Inc.,* 509 F.Supp.2d 210, 214–15 (E.D.N.Y.2007); *Modern Mgmt. Co. v. Wilson,* 997 A.2d 37, 53 (D.C.2010); *Rinehart v. Shelter General Ins. Co.,* 261 S.W.3d 583, 597–98 (Mo.Ct.App.2008). Third, requiring the defendant to request a *Philip Morris* instruction squares with our rules of civil procedure. *See* C.R.C.P. 51 (parties "shall make all objections [to instructions] before they are given to the jury.

Only the grounds so specified shall be considered on motion for a new trial or on appeal or certiorari."); *see also, Voller v. Gertz,* 107 P.3d 1129, 1131 (Colo.App.2004) ("If counsel fails to make a contemporaneous objection to the instructions given to the jury, and if errors are not brought to the attention of the trial court, they are deemed waived."). Finally, requests for jury instructions "enable trial judges to clarify or correct misleading or erroneous instructions before they are given to the jury, and thereby prevent costs of retrials necessitated by obvious and prejudicial error." *Blueflame Gas, Inc. v. Van Hoose,* 679 P.2d 579, 586–87 (Colo. 1984) (citations omitted). We thus hold that a defendant must request a limited-purpose instruction in order to preserve an as-applied challenge to a punitive damages award under *Philip Morris.*

■ Although Qwest did not ask for a limiting instruction, Qwest's objections directed the trial court's attention to *Philip Morris* and the due process concerns raised by its lack of a post-accident inspection program. In the related context of objections under the Colorado Rules of Evidence, we have explained that "even if an objection does not specifically identify the rule underlying the objection, it may nonetheless be sufficient to preserve an issue for appeal if the objecting attorney presents arguments or utilizes language that 'alert[s] the trial judge to the impending error.' " *Am. Family Mut. Ins. Co. v. DeWitt,* 218 P.3d 318, 325 (Colo. 2009) (quoting *People v. Montague,* 181 Colo. 143, 145, 508 P.2d 388, 389 (Colo.1973)). Here, Qwest expressed its concern in its motion in limine that evidence or argument regarding its lack of a post-accident inspection program implied potential harm to nonparties. Qwest thus cited *Philip Morris* as a basis for excluding any evidence of post-accident conduct "for any purpose." By raising the risk that the jury might award punitive damages to punish Qwest for potential harm to others implied by its *post-accident* conduct, Qwest's motion in limine alerted the trial court to the due process concerns articulated in *Philip Morris,* and the trial court discussed these concerns in relation to Qwest's post-accident conduct. Further-

more, immediately after Blood's closing argument, Qwest moved for a mistrial due to Blood's references to Qwest's lack of a post-accident pole inspection program. Even though Qwest failed to request a *Philip Morris* limiting instruction, the trial court, on its own, instructed the jury that "the only conduct that can be considered in relation to the punitive damages is the conduct prior to the date of the accident, that is prior to June 29th, 2004, that is the law."[10] For these reasons, we are convinced that the trial court was sufficiently alerted to *Philip Morris* and the need to protect Qwest from being punished for harm to non-parties implied by its post-accident conduct.

▉ Nothing, however, was said about Qwest's lack of a *pre*-accident inspection program. Qwest's motion in limine only identified the risk that the jury might punish it for the potential harm to non-parties implied by its lack of a post-accident inspection program. The motion did not identify any such risk arising from evidence or argument regarding its lack of a pre-accident inspection program. Moreover, Qwest never requested a limiting instruction regarding its pre-accident conduct or the potential harm to non-parties implied by that conduct. As a result, the trial court was not alerted to the need to protect Qwest from the jury's consideration of Qwest's pre-accident conduct. Thus, even though we realize that evidence or argument regarding Qwest's pre-accident conduct could imply potential harm to non-parties and raise potential *Philip Morris* concerns, we conclude that Qwest has waived its as-applied challenge regarding its pre-accident conduct and thus limit our review to evidence or argument regarding Qwest's post-accident conduct.[11] As such, the issue properly before us is whether the instruction given by the trial court regarding Qwest's post-accident conduct was adequate to satisfy the due process limitations announced in *Philip Morris*. We turn now to that issue.

### 3.

In *Philip Morris*, the defendant requested an instruction explaining to the jury the distinction between the legitimate use of evidence of harm to nonparties to assess reprehensibility and the illegitimate use of such evidence to punish a defendant. 549 U.S. at 350–51, 127 S.Ct. 1057. The Court held that the Due Process Clause requires assurances "that juries are not asking the wrong questions, i.e., seeking, not simply to determine reprehensibility, but also to punish for harm caused strangers." *Id.* at 355, 127 S.Ct. 1057. Thus, even though the Court did not expressly approve the limited-purpose instruction requested by Philip Morris, we infer that a similar instruction would be adequate to satisfy the limitations imposed by the Due Process Clause on exemplary damage awards.

▉ In the instant case, the trial court's instruction was adequate to satisfy the due process requirements announced in *Philip Morris*. The trial court prohibited the jury from considering arguments regarding Qwest's lack of a post-accident pole inspection program for *any* purpose. The jury was even forbidden from considering harm to non-parties for the legitimate purpose of assessing the reprehensibility of Qwest's conduct. *Id.* Thus, to the extent Qwest raised any due process concerns regarding the jury's consideration of its post-accident conduct, it received the benefit of an overly-protective jury instruction. Ultimately then, Qwest's as-applied challenge must boil down to the claim that the jury refused to follow the instruction given by the trial court—the final issue we now address.

### 4.

▉ Absent evidence to the contrary, we presume that a jury follows a trial court's instructions. *See People v. Dunlap*, 975 P.2d 723, 743 (Colo.1999); *Lexton–Ancira Real Estate Fund, 1972 v. Heller*, 826 P.2d 819, 824 (Colo.1992). In *Dunlap*, the defendant was convicted of four counts of capital mur-

---

10. The trial court also cautioned the jury that arguments or statements by counsel are not evidence.

11. Indeed, even in its briefs to this Court, Qwest did not argue that the evidence or argument regarding its pre-accident conduct raised *Philip Morris* concerns.

der and numerous related crimes, and sentenced to death. The defendant appealed, arguing, among other things, that the jury had impermissibly considered the prosecution's rebuttal of mitigation evidence in determining that the defendant was eligible for the death penalty. *Id.* at 742. We disagreed because, "after listing the four specific types of rebuttal of mitigation evidence—the smoking gun tattoo, Dunlap's attempted escape, his drive-by attempted shooting of a rival, and his threats to witnesses—the court instructed the jury that:

> 'You may not consider the testimony from those witnesses testifying on the above-listed matters as an aggravating factor.'
>
> 'If you determine that the testimony from those witnesses has no bearing on the issue of mitigation, then you must disregard the evidence and not consider the evidence for any purpose whatsoever.' "

*Id.* at 742–743. Because there was no evidence to the contrary, we presumed that the jury followed these curative instructions. *Id.* at 743. Accordingly, we concluded that the jury had not improperly considered the rebuttal of mitigation evidence when determining the defendant's eligibility for the death penalty.[12]

Here, the trial court provided the jury with a limiting instruction immediately after Blood's closing argument. As we have noted, this instruction prohibited the jury from considering post-accident evidence for any purpose, and thus provided even more protection than required by *Philip Morris.* Furthermore, this oral instruction was consistent with the trial court's written instructions, which did not specifically address the issue of post-accident evidence. Finally, after this limiting instruction was given, Blood expressly confined his closing rebuttal argument to the period up until the accident—"up until June 29th, 2009 when decades of neglect,

intentional neglect caught up with pole 5905 and it fell and then it hurt Andy Blood." That is, Blood's counsel focused solely on Qwest's failure to inspect P5905 for 46–years prior to Blood's accident. Due to the extensive evidence of Qwest's failure to implement a pre-accident pole inspection program, we presume that the jury followed the trial court's limiting instruction and refused to consider Qwest's post-accident conduct in assessing punitive damages. *See Dunlap,* 975 P.2d at 743; *Lexton–Ancira Real Estate Fund,* 826 P.2d at 824; *Palmer,* 189 Colo. at 360, 540 P.2d at 342.

■ In fact, *Philip Morris* rests on the presumption of law that juries understand and follow a trial court's limiting instructions. The Court carefully explained that the Due Process Clause permits a jury to consider harm to nonparties in assessing reprehensibility, but prohibits a jury from going a step further and directly punishing a defendant for harm to nonparties. *Philip Morris,* 549 U.S. at 355, 127 S.Ct. 1057. Justice Stevens, in his dissent, complained that this fine distinction between the proper and improper use of harm to non-parties, "[t]his nuance[,] eludes me." *Id.* at 360, 127 S.Ct. 1057 (Stevens, J., dissenting). Nonetheless, the majority implied that a jury instruction, like the one requested by Philip Morris, would satisfy the requirements of the Due Process clause. *Id.* at 355, 127 S.Ct. 1057. For this logic to hold true, the majority must have reasoned, consistent with its caselaw, that juries are presumed to follow jury instructions, even where those instructions set forth fine legal distinctions. *See e.g., Richardson v. Marsh,* 481 U.S. 200, 206, 107 S.Ct. 1702, 95 L.Ed.2d 176 (1987) ("This accords with the almost invariable presumption of the law that jurors follow their instructions...."); *Harris v. New York,* 401 U.S. 222, 91 S.Ct. 643, 28

---

**12.** The presumption that the jury follows a court's instructions has been applied in a variety of other contexts. *See e.g., People v. Palmer,* 189 Colo. 358, 360, 540 P.2d 341, 342 (Colo.1975) (presuming that the jury followed an instruction to disregard hearsay evidence and noting that "defense counsel was afforded the opportunity, of which he did not take advantage, of submitting additional curative instructions."); *People v. Anderson,* 183 P.3d 649, 651–52 (Colo.App.2007)

(presuming that jury followed curative instruction to disregard inadmissible testimony, in a sexual assault on a child case, when caseworker improperly testified that she believed victim's allegations were true); *Roget v. Grand Pontiac, Inc.,* 5 P.3d 341, 346 (Colo.App.1999) (objectionable characterization of evidence during closing argument did not constitute reversible error where jury was given a curative instruction).

L.Ed.2d 1 (1971) (holding that statements elicited from defendant in violation of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), can be introduced to impeach that defendant's credibility, even though inadmissible as evidence of guilt, so long as the jury is instructed accordingly). Thus, like the Court, we presume that the jury followed the limiting instruction given in this case, an instruction sufficient to satisfy the procedural requirements of the Due Process Clause as interpreted in *Philip Morris*. Accordingly, we dismiss Qwest's as-applied challenge to section 13–21–102(1).

The dissent below relied on *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), and *People v. Goldsberry*, 181 Colo. 406, 509 P.2d 801 (Colo.1973), for the proposition that the evidence of Qwest's post-accident conduct was so prejudicial that the trial court's jury instruction must have been insufficient. *Blood*, 224 P.3d at 333–34 (Richman, J., concurring in part and dissenting in part). The dissent claimed that Blood's "entire argument for exemplary damages centered on post-accident conduct, and [ ] the post-accident conduct was a theme throughout trial." *Id.* at 335. Accordingly, despite the trial court's instruction to the jury to disregard Qwest's post-accident conduct, the dissent concluded that the jury "punished Qwest's post-accident conduct by awarding $18 million in exemplary damages." *Id.*

Ultimately, Qwest's as-applied challenge also depends on the conclusion that the jury refused to follow the trial court's limiting instruction. We, however, find no need to depart from the presumption that the jury followed the trial court's instruction in this case, let alone follow *Bruton* or *Goldsberry*. *See Dunlap*, 975 P.2d at 743. As an initial matter, the U.S. Supreme Court has emphasized that *Bruton* created a very "narrow exception" to the "almost invariable assumption of the law that jurors follow instructions, *Francis v. Franklin*, 471 U.S. 307, n. 9, 105 S.Ct. 1965, 85 L.Ed.2d 344 (1985), which we have applied in many varying contexts." *Richardson*, 481 U.S. at 206, 107 S.Ct. 1702. In *Bruton*, the Court held that a defendant is deprived of his Sixth Amendment right of confrontation when the facially incriminating confessions of a nontestifying codefendant is introduced at their joint trial, even if the jury is instructed to consider the confession only against the codefendant. 391 U.S. at 135–36, 88 S.Ct. 1620. The *Bruton* Court explained that the extrajudicial statements of a codefendant are "powerfully incriminating," "devastating" and "inevitably suspect" due to the lack of cross-examination. *Id.* In such a context, the Court held that "the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored." *Id.* at 135, 88 S.Ct. 1620. The Court thus refused to rely on a jury instruction to protect a defendant's Sixth Amendment right.

In *Richardson*, however, the Court narrowed *Bruton* to its specific facts. 481 U.S. at 208–11, 107 S.Ct. 1702. The Court held that the Confrontation Clause is not violated by the admission of a non-testifying codefendant's confession with a proper limiting instruction, when the confession is redacted to eliminate not only the defendant's name, but any reference to the defendant's existence as had occurred in the case. *Id.* at 211. *Richardson* thus demonstrates the limited applicability of *Bruton* and the Court's firm reliance on the presumption that a jury follows a court's curative instructions—a presumption that, as noted, formed the basis for the Court's recent decision in *Philip Morris*.

We have similarly limited any exception to the presumption that a jury follows a trial court's instructions. In *Goldsberry*, we dealt with a case where a witness referred to the defendant's prior criminal activity of purchasing drugs. 181 Colo. at 408, 509 P.2d at 802. The trial court subsequently instructed the jury to disregard this testimony, which, as we noted, was inadmissible evidence of the defendant's criminal activity. *Id.* at 803, 509 P.2d 801. We concluded, however, that the trial court's curative instruction was insufficient "to erase the effect of this inadmissible evidence from the minds of the jury ... a mistrial was, [therefore], required in [the] case." 509 P.2d at 803. In support of this position, we cited *Bruton* and further ex-

plained that, because the "the proof of the defendant's guilt was rather thin," the admission of improper evidence was so prejudicial that "it [was] conceivable that but for its exposure, the jury [might] not have found the defendant guilty." *Id.*

Subsequently, however, in *Vigil v. People,* we refused to apply *Goldsberry* and require a new trial due to the admission of improper evidence. 731 P.2d 713, 716 (1987). In *Vigil,* much like in *Goldsberry,* a witness testified about prior drug transactions to which the defendant was never tied. *Id.* at 714. The trial court instructed the jury to disregard this evidence. *Id.* We affirmed the conviction, despite the improper evidence, due to the fact that "the trial court's curative instruction was clear" and that the "evidence of guilt was overwhelming." *Id.; see also People v. Ellis,* 30 P.3d 774, 778 (Colo.App.2001) (declining to apply *Goldsberry* and, instead, applying the presumption that the jury followed the trial court's curative instruction). The circumstances are thus rare where we or the U.S. Supreme Court will depart from the presumption that a jury follows a court's curative instructions.

We are not persuaded that the facts of this case fit the mold of *Bruton* or *Goldsberry.* *Bruton* involved inadmissible hearsay evidence, i.e. the confession of a nontestifying codefendant, that inculpated the defendant and violated his fundamental right to confrontation. 391 U.S. at 128 n. 3, 88 S.Ct. 1620. Similarly, *Goldsberry* involved inadmissible evidence, namely statements by a witness about the defendant's unrelated criminal activity. 509 P.2d at 802. In contrast, Blood's closing argument regarding Qwest's post-accident conduct was consistent with the trial court's ruling that Qwest had opened the door to this evidence.[13]

 Indeed, Qwest itself was responsible for admitting a significant amount of testimo-

ny regarding post-accident pole inspection practices. Pursuant to the trial court's ruling, Blood only asked one very limited question regarding Qwest's lack of a post-accident inspection program. In contrast, Qwest asked a number of questions regarding post-accident conduct. For example, it asked an Xcel witness about Xcel's lack of a post-accident inspection program and Xcel's knowledge that Qwest similarly lacked such a program. In closing argument, Qwest again emphasized Xcel's failure to implement a pole inspection program for the 12 years between 1995 and the trial. Qwest even conceded in its closing argument that it had failed to implement an inspection program "for longer than [Xcel], but they have engaged in exactly the same kind of conduct and ignored that provision, those provisions of the Joint Use Contract that state that the owner of the pole at its expense must maintain the pole in safe and serviceable condition." In this light, Qwest made post-accident conduct the cornerstone of its closing argument, thereby undermining any argument that Blood was solely responsible for making such conduct "a theme throughout the trial...." *Blood,* 224 P.3d at 335 (Richman, J., concurring in part and dissenting in part).

Moreover, unlike *Bruton* and *Goldsberry,* the evidence of Qwest's post-accident conduct did not create a risk so great "that the practical and human limitations of the jury system cannot be ignored." 391 U.S. at 135, 88 S.Ct. 1620. The dissent below inferred that the jury must have disregarded the trial court's instructions due to the fact that Blood's entire argument for exemplary damages focused on post-accident conduct. *Blood,* 224 P.3d at 335. To be clear though, the evidence also demonstrated that Qwest had failed to inspect P5905 for the 46 years *prior* to Blood's accident. Due to the extent of Qwest's pre-accident conduct, Blood ex-

---

**13.** Due to the trial court's ruling that Qwest opened the door, we need not determine whether the trial court erred in the first place by granting Qwest's motion in limine to exclude evidence of Qwest's post-accident conduct. Nonetheless, we do take the time to note that Qwest's motion in limine was based on the false premise that *Philip Morris* stands for the proposition that a jury may not consider evidence of non-party harm when

assessing punitive damages. To be clear, *Philip Morris* addresses a jury's use of harm to non-parties, not necessarily the admissibility of that evidence. The Court even stated that a jury may consider evidence of non-party harm when assessing the reprehensibility of the defendant's conduct. *Philip Morris,* 549 U.S. at 355, 127 S.Ct. 1057.

pressly confined his rebuttal closing argument to the time period "up until June 29th, 2004," emphasizing Qwest's "40 years of failing to inspect poles" and the fact "that Qwest had no idea prior to June 29th how many of its poles were defective." In this light, we cannot conclude that the admission of three years of post-accident evidence was so highly prejudicial that the jury was incapable of following the trial court's instruction to disregard this evidence.

Finally, to the extent Blood's attorney did mention Qwest's post-accident lack of a periodic pole inspection program, the primary purpose of the argument was to emphasize the willful and wanton nature of Qwest's conduct—an entirely legitimate argument under *Philip Morris*. This case is, therefore, distinct from *Goldsberry* where the inadmissible evidence was so prejudicial that but for the jury's exposure to it, "the jury [might] not have found the defendant guilty." 509 P.2d at 803. Similarly, unlike *Bruton*, we cannot say that the three years of Qwest's post-accident conduct was as "powerfully incriminating" or "devastating" as a codefendant's confession that expressly inculpated a defendant. 391 U.S. at 135–36, 88 S.Ct. 1620. Rather, we presume that the jury was capable of understanding and following the trial court's limiting instruction. Accordingly, because the trial court's instruction satisfied the requirements of the Due Process Clause as interpreted in *Philip Morris*, and because Qwest has failed to overcome the presumption that the jury followed the trial court's overly-protective instruction, we dismiss Qwest's as-applied challenge under *Philip Morris*.

### III. Sufficiency Under State Law

 In Colorado, exemplary damages are available in accordance with section 13–21–102(1)(a) when "the injury complained of is attended by circumstances of fraud, malice, or willful and wanton conduct. . . ." In turn, section 13–21–102(1)(b) defines "willful and

wanton conduct" as "conduct purposefully committed which the actor must have realized as dangerous, done heedlessly, and recklessly, without regard to consequences, or of the rights and safety of others, particularly the plaintiff." The party requesting exemplary damages must prove the statutory requirements for an exemplary damages award beyond a reasonable doubt. *See* § 13–25–127(2), C.R.S. (2010); *see also Tri–Aspen Constr. Co. v. Johnson*, 714 P.2d 484, 486 (Colo.1986) (noting that the "reasonable doubt burden is by definition a heavy one"). The question of whether the evidence was sufficient to justify an award of exemplary damages is one of law that we review de novo. *See Coors v. Security Life of Denver Ins. Co.*, 112 P.3d 59, 66 (Colo.2005). In resolving this question, the standard to be applied is whether the evidence, viewed in its totality and in the light most supportive of the verdict, supports the jury's finding on this issue. *Id.*

On appeal, Qwest contends that the record is insufficient to sustain the punitive damages award, beyond a reasonable doubt, under a de novo review. Qwest argues that the willful and wanton nature of its conduct must be assessed with regard to what it actually knew before Blood's accident, not what it should have known with the assistance of hindsight. Qwest thus claims that, before the accident, it neither knew nor suspected that its actions would lead to the injury of a well-trained pole climber. As such, Qwest urges us to find that there is insufficient evidence to meet the statutory requirements of section 13–21–102(1)(b) for an exemplary damages award.[14]

 Based on our own de novo review of the record, we disagree with Qwest's arguments. In *Coors*, we explained that "[w]here the defendant is conscious of his conduct and the existing conditions and knew or should have known that injury would result, the statutory requirements of section 13–21–102 are met." 112 P.3d at 66. It has also been

---

14. Qwest also cites the dissent's statement that "Qwest's actions appear more negligent than willful and wanton, which casts doubt on the constitutionality of the jury's exemplary damages award." *Blood*, 224 P.3d at 333 (Richman, J., concurring in part and dissenting in part). This statement was made in the context of the dissent's substantive due process analysis and, in particular, its analysis of the first *Gore* reprehensibility factor. Our substantive due process analysis is, however, separate from our willful and wanton analysis under Colorado law.

often stated that before a plaintiff may recover exemplary damages he must show that the defendant, "while conscious of his conduct and cognizant of existing conditions, knew or should have known, that the injury would probably result from his acts." *Pizza v. Wolf Creek Ski Dev. Corp.*, 711 P.2d 671, 685 (Colo.1985) (citations omitted); *see also Foster v. Redding*, 97 Colo. 4, 45 P.2d 940 (Colo. 1935). Here, the evidence demonstrates that a jury could find, beyond a reasonable doubt, that Qwest consciously forewent a periodic pole inspection program and knew or should have known that this conduct would probably result in injury.

At trial, nobody disputed the fact that wooden utility poles rot over time, thereby jeopardizing their structural integrity. In this light, the need to periodically inspect poles has been known to the utility industry for at least 50 years. The purpose of a periodic pole inspection program is to greatly reduce the number of poles that pose a danger to workers and the public. In fact, the JUC between Qwest and Xcel referred to both the Edison Electric Institute manual and the National Electrical Safety Code as the "accepted modern methods" for inspecting, maintaining, and repairing poles. Even though Qwest disclaims any contractual obligation to comply with either of these modern methods for inspecting poles, it did not dispute at trial its common-law duty to periodically inspect its poles to assure that they would not lose their structural integrity and collapse. In fact, in 1980, Qwest took steps to initiate an inspection program. Within three weeks however, this pilot program was ordered "discontinued immediately." Qwest has not initiated a similar inspection program since. As a result, Qwest has no records demonstrating that it ever inspected P5905 for the 46 years prior to Blood's accident. Similarly, Qwest lacked any records relating to a periodic or routine pole inspection program for any of its poles.

Qwest attempts to justify its lack of a pole inspection program on the grounds that it reasonably relied upon pre-climb inspections by linemen. The overwhelming evidence, however, demonstrates that pre-climb inspections are no substitute for a periodic pole

inspection program. As part of a pre-climb inspection, linemen rely on a visual inspection and hammer sounding to determine if the particular pole is structurally sound. In contrast, a periodic inspection program includes the additional step of excavating 12 to 18 inches below ground and then drilling bore holes to the center of the pole. These bore holes are essential to detect any internal rot hidden below ground. In fact, as Qwest's pole expert explained, a pre-climb inspection is insufficient because neither the visual inspection nor the hammer sounding detect internal rot hidden below ground. As such, Qwest's expert conceded that the *only* way for Qwest to ensure the safety of workers and the public was to have a periodic inspection program. Qwest cannot therefore claim that it acted reasonably by relying on pre-climb inspections to detect internal, below ground rot and prevent pole failures. To the contrary, Qwest should have known that its decision to forego a periodic pole inspection program would inevitably lead to injury, especially given that experienced linemen were unable to detect belowground internal rot based on their pre-climb inspections alone. There is, therefore, no justification for Qwest's conduct.

But, Qwest claims, it never experienced an accident similar to the one suffered by Blood and thus lacked actual knowledge that its conduct or lack thereof would result in injury. In other words, Qwest argues that because its conduct did not result in injury for so many years, the record is insufficient to prove, beyond a reasonable doubt, that Qwest was "conscious of its conduct and the existing conditions and knew or should have known that injury would result" prior to Blood's accident. *Coors*, 112 P.3d at 66. Injury to other linemen prior to Blood's accident would be evidence of the willful and wanton nature of Qwest's conduct. *See e.g., Jacobs v. Commonwealth Highland Theatres, Inc.*, 738 P.2d 6, 10 (Colo.App.1986). Nonetheless, the lack of evidence of prior injuries does not preclude a finding by the jury that Qwest knew or should have known that its conduct would result in injury. Instead, Blood's accident, although the first to a lineman, confirmed what should have been known to Qwest prior to the accident—ab-

sent a routine inspection program, wooden utility poles inevitably rot and can collapse causing catastrophic injury. Due to the serious risk of injury presented by collapsing poles, both the Edison Electric Institute manual and the NESC, which were mentioned in the JUC, set forth specific safety requirements for routinely inspecting poles. Qwest, however, refused to implement a periodic pole inspection program. This failure to prevent accidents further proves the willful and wanton nature of Qwest's conduct.

Viewing the evidence in its totality and in the light most favorable to the verdict, we hold that the jury could have found beyond a reasonable doubt that Qwest's conscious decision not to periodically inspect its poles, despite the fact that it should have known the danger this course of action posed, was willful and wanton beyond a reasonable doubt.

## IV. Substantive Due Process

 Lastly, Qwest challenges the jury's $18 million punitive damages award on the grounds that it was excessive and disproportionate, in violation of Substantive Due Process under *Gore*, 517 U.S. 559, 116 S.Ct. 1589. Appellate review of the constitutionality of an exemplary damages award is de novo, with the court determining whether the amount is within a constitutionally permissible range which is not "grossly excessive."

*Cooper Indus.*, 532 U.S. at 436, 121 S.Ct. 1678.

 In *Gore*, the U.S. Supreme Court identified three guideposts that courts must use when reviewing whether a jury's punitive damages award comports with due process: (1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases. 517 U.S. at 575, 116 S.Ct. 1589; *see also Cooper Indus.*, 532 U.S. at 440, 121 S.Ct. 1678; *State Farm*, 538 U.S. at 418, 123 S.Ct. 1513.[15] We conduct a de novo review of the jury's $18 million exemplary damages award by applying these three guideposts to the instant case.[16]

### A. Reprehensibility

 The U.S. Supreme Court has stated that "[p]erhaps the most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct." *Gore*, 517 U.S. at 575, 116 S.Ct. 1589. The Court reasoned that a punitive damages award should reflect "the enormity of the offense" and "the accepted view that some wrongs are more blameworthy than other." *Id.* at 575, 116 S.Ct. 1589. The Court has analyzed the *Gore* reprehensi-

**15.** Amicus Curiae Chamber of Commerce of the United States ("Chamber") argues that the court of appeals made a fundamental mistake by failing to review whether the $18 million award is greater than reasonably necessary to punish and deter. We agree that "in analyzing a punitive damages award for excessiveness, [a court must] consider the goal of deterrence." *Deters v. Equifax Credit Info. Services*, 202 F.3d 1262, 1272 (10th Cir.2000) (citing *Gore*, 517 U.S. at 584, 116 S.Ct. 1589). That is not to say, however, that the reviewing court must determine what is "reasonably necessary" to deter. Rather, the question is whether the award is "grossly excessive" in violation of substantive due process. *See Cooper Indus.*, 532 U.S. at 436, 121 S.Ct. 1678. In *Gore*, the Court identified three guideposts "to illuminate the character of the standard that will identify unconstitutionally excessive awards' of punitive damages...." 517 U.S. at 568, 116 S.Ct. 1589 (citing *Honda Motor Co. v. Oberg*, 512 U.S. 415, 420, 114 S.Ct. 2331, 129 L.Ed.2d 336 (1994)). Because we must apply the three *Gore*

guideposts to determine whether the punitive damages award violates due process, we necessarily consider the deterrent purpose of the award and whether the award was "grossly excessive."

**16.** Our analysis of the three *Gore* guideposts is independent from our analysis of willful and wanton conduct in Section III above. For constitutional purposes, we do not defer to the exemplary damages award. *Cooper Indus.*, 532 U.S. at 440, 121 S.Ct. 1678. Moreover, as the U.S. Supreme Court explained in *Cooper Industries*, "the level of punitive damages is not really a 'fact' 'tried' by the jury." *Id.* at 437 (citations omitted). As such, the Court instructed appellate courts to review de novo the "determinations of the constitutionality of punitive damages awards." *Id.* at 436. Accordingly, our de novo review is not limited by the trial court's overlyprotective instruction prohibiting the jury from considering post-accident conduct. Rather, we may consider all the evidence on appeal.

bility guidepost according to the following five criteria:

> the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident.

*State Farm*, 538 U.S. at 419, 123 S.Ct. 1513. "The existence of any one of these [criterion] weighing in favor of a plaintiff may not be sufficient to sustain a punitive damages award; and the absence of all of them renders any award suspect." *Id.* We analyze each of these five criteria.

### (i) Physical or Economic Harm

It is undisputed that the injury to Blood was physical, as opposed to economic. The U.S. Supreme Court has explained that physical harm is an "aggravating factor" associated with "particularly reprehensible conduct[.]" *Gore*, 517 U.S. at 576, 116 S.Ct. 1589. Here, Blood's catastrophic injuries, including paraplegia from the waist down, weigh heavily in favor of finding that Qwest's conduct was sufficiently reprehensible to sustain the exemplary damages award.

Nonetheless, Qwest complains that it was punished not for the vileness of its conduct, but rather for the vileness of Blood's physical injuries. To the extent Qwest attempts to turn Blood's physical injuries to its advantage, it contradicts U.S. Supreme Court precedent which clearly instructs us to consider physical injury as a criterion supporting an award of exemplary damages. *Id.; see also State Farm*, 538 U.S. at 419, 123 S.Ct. 1513.

### (ii) Indifference to or Reckless Disregard for the Safety of Others

■ The second criterion focuses on whether the "tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others." *State Farm*, 538 U.S. at 419, 123 S.Ct. 1513. In *Philip Morris,* the Court explained that "conduct that risks harm to many is likely more reprehensible than conduct that risks harm to only a few" and that a "jury consequently may take this fact into account in determining reprehensibility." 549 U.S. at 355, 127 S.Ct. 1057. In the instant case, Blood contends that Qwest's conduct demonstrated a conscious disregard, if not gross indifference, for the health and safety of every Coloradan who came in contact with a Qwest pole. In response, Qwest argues that it is an overstatement to argue that its failure to implement a periodic pole inspection program endangered every Coloradan. Rather, Qwest claims, the failure of P5905 was a freak accident and, thus, its failure to implement a pole inspection program only harmed a single lineman.

The evidence does demonstrate that Blood's accident was compounded by a set of rare, or more precisely unfortunate, circumstances. Typically, the high-voltage cables and guywires attached to a utility pole provide stability and support. In the three weeks prior to the accident, however, Qwest and Xcel crews removed the high-voltage cables and sole supporting guywire from P5905. Unsupported, P5905 was more prone to collapsing under the weight of a lineman due to its internal rot below ground.

The unfortunate circumstances leading up to Blood's accident do not, however, minimize the risk posed by Qwest's lack of a periodic pole inspection program, let alone suggest that Qwest's conduct only posed a threat of harm to one single lineman. Rather, Qwest's failure to implement a periodic pole inspection program demonstrates a conscious indifference to the safety of linemen. The evidence established that Qwest owned approximately 157,000 poles in Colorado. Moreover, as Xcel's experts explained, lineman routinely climb supported and unsupported poles alike. Finally, Qwest's experts conceded that a periodic pole inspection program is the only way to detect internal rot below ground. In fact, the record demonstrates that such a periodic pole inspection program would have detected P5905's internal rot—the root cause of P5905's failure.

In this light, Blood's accident was the inevitable product of Qwest's failure to implement a periodic pole inspection program for almost five decades. This failure demonstrated a conscious indifference for the safety

of others, particularly other lineman. Thus, even though we are unprepared to conclude that Qwest's conduct endangered every Coloradan who came in contact with a utility pole, we find that Qwest's conduct did demonstrate indifference for the safety of others.

### (iii) Financially Vulnerable Target

█ The financial vulnerability of a plaintiff is particularly relevant where the harm inflicted is economic in nature. *See Gore,* 517 U.S. at 576, 116 S.Ct. 1589 (explaining that the "infliction of economic injury, especially when done intentionally through affirmative acts of misconduct, or when the target is financially vulnerable, can warrant a substantial penalty."); *see also Clark v. Chrysler Corp.,* 436 F.3d 594, 604 (6th Cir. 2006). This criterion has played an important role in cases where the defendant targeted a plaintiff's financial vulnerability. *See e.g., Willow Inn, Inc. v. Public Service Mut. Ins. Co.,* 399 F.3d 224, 233 (3d Cir.2005) (defendant insurer, in bad faith, withheld insurance payment from a "modest family-run business" that depended upon the payment); *Kemp v. American Tel. & Tel. Co.,* 393 F.3d 1354, 1363 (11th Cir.2004) (finding that AT & T's fraudulent conduct targeted customers who were "unsophisticated and economically vulnerable"). Here, there was no evidence that Blood's financial vulnerability, if any, motivated Qwest's decision to forego a periodic pole inspection program. Accordingly, this criterion counsels in favor of Qwest.

### (iv) Repeated Actions or Isolated Conduct

The U.S. Supreme Court has explained that "repeated misconduct is more reprehensible than an individual instance of malfeasance." *Gore,* 517 U.S. at 577, 116 S.Ct. 1589. At trial, Qwest did not dispute the fact that it had a duty to periodically inspect its poles to ensure that they did not develop rot and collapse. Its experts further agreed that the only way to ensure pole safety was to implement a periodic inspection program that included below ground bore samples. Nonetheless, Qwest failed to implement a routine inspection program for almost five decades—a fact underscored by its lack of

any records of inspection over the 46–year life of P5905. Qwest's conduct thus demonstrated a repeated "disrespect for the law." *Id.; See also Willow Inn, Inc.,* 399 F.3d at 233 (applying *State Farm's* "repeated conduct" factor to conduct that was, in part, nonfeasance).

Qwest attempts to characterize its failure to implement a periodic pole inspection program as a single course of conduct within one extended transaction (i.e. the JUC), not "repeated conduct" within the meaning of *State Farm.* Relying on the statement in *Willow Inn* that the repeated conduct criterion involves "specific instances of similar conduct by the defendant in relation to *other parties* [,]" 399 F.3d at 232 (emphasis added), Qwest contends that in this case there were no specific instances of similar conduct in relation to other parties. Instead, as Qwest emphasizes, there was no evidence of actual injury to other linemen, the public, or anyone else.

This argument is misplaced. The Third Circuit has explained that "while the repeated conduct' [criterion] will necessarily have less force where the defendant's misconduct did not extend beyond his dealings with the plaintiff, it may still be relevant in measuring the reprehensibility of the defendant's conduct, based on the particular facts and circumstances presented." *CGB Occupational Therapy, Inc. v. RHA Health Services, Inc.,* 499 F.3d 184, 191 (3d Cir.2007) (citations omitted). Thus, even if Qwest's failure to periodically inspect its poles for almost five-decades only resulted in the injury to Blood, this repeated conduct is still relevant in measuring the reprehensibility of Qwest's conduct, particularly because a periodic pole inspection program would have, in all probability, detected P5905's internal rot and averted Blood's injury.

Second, and more importantly, the record demonstrates that Qwest's misconduct extended beyond the case before us. Qwest lacked a routine pole inspection program not only for P5905, but for all 157,000 poles it owned. It thus failed to conduct hundreds of thousands of inspections for its others poles. Such repeated misconduct jeopardized not just Blood, but also the safety of other line-

men and potentially the public, and exemplifies the conduct of a repeat offender.

### (v) Intentional Malice, Trickery, or Deceit

The concept that trickery and deceit are more reprehensible than negligence reflects the principle that exemplary damages may not be "grossly out of proportion to the severity of the offense." *Gore,* 517 U.S. at 576, 116 S.Ct. 1589 (quotations and citations omitted). In *Gore,* the Court concluded that the defendant's conduct was not sufficiently reprehensible to warrant a $2 million award and noted the absence of "deliberate false statements, acts of affirmative misconduct, or concealment of evidence of improper motive." *Id.* at 579, 116 S.Ct. 1589. Thereafter, in *State Farm,* the Court added "intentional malice, trickery, or deceit" to the list of factors that courts should consider in assessing reprehensibility. 538 U.S. at 419, 123 S.Ct. 1513.

 There is no evidence here that Qwest engaged in any acts of intentional malice, trickery, or deceit. At the same time though, it cannot be said that Blood's injury was the result of a "mere accident" as Qwest claims. The trial transcript reveals that Qwest failed to implement a periodic pole inspection program, choosing instead to discontinue immediately a pilot inspection program after only three weeks. It was therefore inevitable that a pole would develop internal decay below ground and collapse under the weight of an unsuspecting lineman—the circumstances of Blood's accident. Indeed, even after Blood's accident, Qwest still refused to implement a periodic pole inspection program. Moreover, the jury concluded, beyond a reasonable doubt, that Qwest's conduct was "willful and wanton" and justified an award of punitive damages pursuant to section 13–21–102(1)(b). Thus, even though there was no evidence of intentional malice, trickery or deceit, we are unwilling to find that this criterion weighs in Qwest's favor. Rather, we find that this criterion neither weighs in favor nor counsels against the reprehensibility of Qwest's conduct.

In sum, three of the five criteria listed in *State Farm* weigh in favor of reprehensibility. The five criteria viewed as a whole indicate that Qwest's conduct was sufficiently reprehensible to warrant an $18 million exemplary damages award.

### B. Actual or Potential Harm Suffered Versus Punitive Damages

"The second and perhaps most commonly cited indicium of an unreasonable or excessive punitive damages award is its ratio to the actual harm inflicted on the plaintiff." *Gore,* 517 U.S. at 580, 116 S.Ct. 1589. The U.S. Supreme Court, however, has been reluctant to identify "concrete constitutional limits on the ratio." *Id.* at 582, 116 S.Ct. 1589. Rather, the Court has explained that the ratio is merely a tool to determine whether " 'there is a reasonable relationship between the punitive damages award and *the harm likely to result* from the defendant's conduct as well as the harm that actually has occurred[.]' " *TXO Prod. Corp. v. Alliance Res. Corp.,* 509 U.S. 443, 460, 113 S.Ct. 2711, 125 L.Ed.2d 366 (1993) (emphasis in original) (quoting *Pacific Mut. Life Ins. Co. v. Haslip,* 499 U.S. 1, 21, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991)).

Blood argues that the Colorado General Assembly has already addressed this guidepost by imposing a mandatory cap on exemplary damages. Section 13–21–102(1)(a) expressly imposes a one-to-one ratio between compensatory and exemplary damages. *See* Section 13–21–102(1)(a) ("The amount of such reasonable exemplary damages shall not exceed an amount which is equal to the amount of the actual damages awarded to the injured party."). Here, the jury awarded Blood $18 million in exemplary damages, slightly less than the $21 million in compensatory damages. Because the award comports with section 13–21–102(1)(a) and the "single-digit" ratio guidance mentioned in *State Farm,* 538 U.S. at 425, 123 S.Ct. 1513 (suggesting that "a lesser ratio, perhaps only equal to compensatory damages" may be merited), Blood argues that the second *Gore* guidepost necessarily points in favor of the exemplary damages award.

Qwest, in turn, contends that section 13–21–102(1)(a)'s one-to-one ratio cannot automatically validate the $18 million punitive damages award. Qwest cites *Inter Medical Supplies, Ltd. v. EBI Medical Systems, Inc.*, for the position that even a one-to-one ratio can violate due process where there is insufficient reprehensible conduct. 181 F.3d 446 (3d Cir.1999). Qwest also attacks the punitive damages award by challenging the $21 million compensatory damages award underlying the one-to-one ratio.[17] First, Qwest claims that the enormous $21 million dollar compensatory damages award fully satisfies Colorado's interests in deterrence. *See State Farm*, 538 U.S. at 419, 123 S.Ct. 1513 ("[P]unitive damages should only be awarded if the defendant's culpability, *after having paid compensatory damages*, is so reprehensible as to warrant the impositions of further sanctions to achieve punishment or deterrence.") (emphasis added). Alternatively, Qwest claims that the compensatory damages award contains a significant punitive element due to the $11,750,000 award for physical impairment, non-economic damages, and loss of consortium. *See Id.* (explaining that a large punitive damages award is not justified where a compensatory damages award includes a punitive element that is then duplicated in the punitive damages award). For these reasons, Qwest claims that the punitive damages award is excessive and requests that we reduce it pursuant to section 13–21–102(3).

Section 13–21–102(1)(a)'s one–to–one ratio limited the exemplary damages award to $18 million, an amount equal to or less than the compensatory damages award of $21 million. This result strongly supports the exemplary damages award. *See State Farm*, 538 U.S. at 425, 123 S.Ct. 1513 ("a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due

process"). At the same time, however, this result fails to address our concerns about the absolute size of the $18 million exemplary damages award and the underlying $21 million compensatory damages award. We thus agree with Qwest that the one-to-one ratio in section 13–21–102(1)(a) does not automatically validate the exemplary damages award in this case.[18] Accordingly, we now turn to address Qwest's challenges to the compensatory damages award and the absolute size of the awards in this case.

Although the $21 million compensatory damages award is a very large sum by any measure, we do not believe that it necessarily satisfies the deterrent purpose of Colorado law or contains a punitive element. First, the jury implicitly concluded that punitive damages were necessary to deter another accident similar to Blood's. By enacting section 13–31–102(1)(a), the General Assembly directed juries to award exemplary damages upon a finding of "willful and wanton" conduct beyond a reasonable doubt. We affirmed, on de novo review, the jury's finding that Qwest's conduct was willful and wanton beyond a reasonable doubt due in part to the fact that Qwest had failed to implement a periodic pole inspection program for almost five decades, thereby endangering linemen and the public. Based on section 13–31–102(1)(a), the jury's implicit finding of willful and wanton conduct, and our own de novo supporting that finding, we conclude that exemplary damages are warranted to satisfy Colorado's interest in deterring misconduct. *See Gore*, 517 U.S. at 568, 116 S.Ct. 1589 ("Punitive damages may properly be imposed to further a State's legitimate interest in punishing unlawful conduct and deterring its repetition.").

■ Second, there is no evidence that the components of the compensatory damages

---

17. To be clear though, Qwest does not claim that the jury's compensatory damages award was influenced by "bias, prejudice, and passion." *See e.g., Marks v. District Court*, 643 P.2d 741, 744 (Colo.1982) ("where the trial judge has made a finding that the excessive jury verdict resulted from bias, prejudice, and passion, firmly established precedent requires that a new trial on all issues be granted.")

18. We also agree with Qwest's citation to *Inter Medical Supplies, Ltd.*, 181 F.3d 446, for the position that even a one-to-one ratio can violate due process where there is insufficient evidence of reprehensible conduct. Again, the degree of reprehensibility is "[p]erhaps the most important indicium of the reasonableness of a punitive damages award." *Gore*, 517 U.S. at 575, 116 S.Ct. 1589.

award are duplicated in the exemplary damages award. The dissent below speculated that "based on the way physical impairment was argued [by Blood's attorney] ... at least some pain and suffering was included in the physical impairment award" of $10,000,000, thereby rendering it duplicative of the punitive damages award. *Blood*, 224 P.3d at 332 (Richman, J., concurring in part and dissenting in part). This argument fails to appreciate the fact that compensatory damages "are intended to redress the concrete loss that the plaintiff has suffered." *Cooper Indus.*, 532 U.S. at 432, 121 S.Ct. 1678. The jury was instructed by the trial court that the award for physical impairment could not overlap any award for pain and suffering. Blood's closing argument complied with this instruction in arriving at a figure of between $10 and $15 million dollars for physical impairment and disfigurement. Blood's attorney listed the various physical impairments resulting from Blood's spinal injury, including, among other things, decreased neuromuscular skeletal function (i.e., loss of sensation and motor skills), osteoporosis, a neurogenic bladder, loss of bowel function, loss of reproductive function, decreased circulatory function, and impaired cognitive function. Blood's attorney then suggested monetary compensation for these physical impairments of between $200,000 and $300,000 for every year of Blood's life. Finally, based on actuarial tables and the fact that Blood had slightly more than 50 years to live, Blood's attorney proposed a figure of between $10 and $15 million for physical impairment alone. Contrary to the dissent's position then, this presentation of evidence suggests that the jury's award of $10 million for physical impairment was designed to redress Blood for the concrete physical losses over

his lifetime, not to punish Qwest for Blood's pain and suffering.[19]

The same logic supports the jury's award of $9,917,600 for economic losses. Although this award is a very substantial sum, it is supported by the evidence presented at trial. Blood's economic expert, Doctor Patricia Pacey, explained that the total present value of Blood's earning capacity, over his working lifetime, was $3,205,500.[20] Furthermore, Pacey calculated that Blood would incur significant medical expenses over his lifetime, amounting to over $8 million. Finally, the parties stipulated to $867,000 in past medical expenses. In light of this evidence, the jury's compensatory award of $9,917,600 for economic losses, albeit large, reflects the concrete losses suffered by Blood over his lifetime.

■ Ultimately then, even though the compensatory damages award of $21 million is very large in absolute terms, it reflects concrete losses suffered by Blood and thus provides a reliable denominator for judging the absolute size of the exemplary damages award. Because the ratio between exemplary and compensatory damages in this case is less than one-to-one, we are unwilling to conclude that the jury's exemplary damages award violates due process. *State Farm*, 538 U.S. at 425, 123 S.Ct. 1513 ("When compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee."). We are also unwilling to conclude that the $18 million exemplary damages award is unconstitutional based on amount alone. In fact, assuming that Blood will live for a little more than 50 years and without taking into account the time value of money, the $18 million exem-

19. Additionally, Qwest argues that the jury's $1,000,000 award for non-economic damages is actually punitive in nature and thus duplicates the punitive damages award. *See State Farm*, 538 U.S. at 426, 123 S.Ct. 1513. We disagree. Non-economic damages are awarded to compensate the plaintiff for an injury (i.e., for mental pain and suffering, inconvenience, emotional stress and impairment of the quality of life). It would be inappropriate to categorize the non-economic damages in this case as punitive, particularly given the extent of Blood's physical injuries.

20. Doctor Pacey used the following methodology to calculate Blood's lost wages. First, Pacey identified Blood's hourly wage as $24.98, which translates into approximately $52,000 per year. Pacey then added 20% to this salary base to account for benefits. Without assuming any job advancements, but assuming typical wage increases of 4% per year, Blood's base salary as of trial was $69,800. Extending this income stream to a retirement age of 65, Pacey arrived at a net present value of $3,205,500.

plary damages award equates to approximately $360,000 per year. In light of this yearly amount and the ratio of less than one-to-one between compensatory and exemplary damages, we conclude that the second *Gore* guidepost supports the exemplary damages award in this case.

### C. Difference Between Exemplary Damages and Available Civil Remedies

"The third guidepost in *Gore* is the disparity between the punitive damages award and the civil penalties authorized or imposed in comparable cases." ' *State Farm*, 538 U.S. at 428, 123 S.Ct. 1513 (quoting *Gore*, 517 U.S. at 575, 116 S.Ct. 1589). Here, Qwest's conduct involved a violation of tort duties that do not readily lend themselves to a comparison with statutory penalties. As the Tenth Circuit has observed

a violation of common law tort duties [may] not lend [itself] to a comparison with statutory penalties. The fundamental question is whether [the defendant] had reasonable notice that its tortious interference with contracts and prospective business advantage could result in such a large punitive award.

*Continental Trend Res., Inc. v. OXY USA Inc.*, 101 F.3d 634, 641 (10th Cir.1996). Accordingly, our analysis of this *Gore* guidepost shifts from a focus on comparable statutory penalties to an inquiry into the fundamental question of whether Qwest had reasonable notice that its conduct could result in a substantial exemplary damages award.

■■■ As the court of appeals explained, Qwest was on notice of its potential liability due to Colorado's exemplary damages statute and other cases upholding large exemplary damages awards under Colorado Law. *See Blood*, 224 P.3d at 318 (collecting cases). Moreover, Qwest's liability in this case was not founded on a novel cause of action. *See Kelsay v. Motorola, Inc.*, 74 Ill.2d 172, 187–88, 23 Ill.Dec. 559, 384 N.E.2d 353 (1978). Rather, Qwest could have determined before Blood's accident that it had a common-law duty to implement a periodic inspection program to detect internal rot and prevent inevitable pole failures that might injure linemen or the public. Finally, in Article XII of the JUC, Qwest and Xcel included a liability-shifting provision. Evidently then, Qwest recognized the extensive liabilities that could result from an injury to an Xcel lineman and attempted to contractually protect itself from significant compensatory and exemplary damages award. Accordingly, we conclude that Qwest did have sufficient notice of the exemplary damages award. As a result, this third *Gore* guidepost points in favor of the exemplary damages award.

### D. Resolution

Ultimately, an application of the *Gore* guideposts to the facts of this case, especially in light of the reprehensibility of Qwest's conduct, justifies the jury's exemplary damages award that was slightly less than compensatory damages.

### V. Conclusion

For the foregoing reasons, we dismiss Qwest's facial and as-applied challenges to section 13–21–102(1)(a) under *Philip Morris*. We also conclude, on de novo review, that the evidence demonstrates Qwest's willful and wanton conduct beyond a reasonable doubt. Finally, we conclude that the exemplary damages award was not "grossly excessive" in violation of due process. Thus, we affirm the court of appeals decision upholding the jury's exemplary damages award.

Justice EID dissents, and Justice RICE joins in the dissent.

Justice COATS does not participate.

Justice EID, dissenting.

In closing argument, Blood's counsel repeatedly argued that punitive damages were justified in this case because Qwest had failed to adopt a periodic pole inspection program subsequent to Blood's injury—a line of argument that was improper under the district court's pretrial ruling excluding evidence of Qwest's post-injury conduct. In order to gauge the impact of that closing argument on the jury, one need only consider the fact that the district court, on the basis of trial proceedings alone, ordered post-trial

*trebling* of the punitive damages award against Qwest. Given counsel's singular focus on post-injury conduct, coupled with the significant impact that such a focus had on the court (and hence the jury), the district court's oral instruction to the jury to consider evidence only up to the date of Blood's injury was ineffective. In fact, the oral instruction was inconsistent with the written instruction on punitive damages that the jury had before it, as the written instruction contained no such temporal limitation. The jury was thus faced with inconsistent instructions on the temporal issue, making the majority's heavy reliance on the presumption that "jurors follow their instructions" unconvincing at best. Because there is little assurance that the jury's punitive damages award was not based on post-accident conduct, the punitive damages award must be set aside.[1] Accordingly, I respectfully dissent.

Prior to trial, the district court granted Qwest's motion in limine excluding from trial any evidence of Qwest's conduct that took place after Blood's injury. Despite this ruling, Blood's counsel during closing argument repeatedly referenced Qwest's post-injury conduct—specifically, its failure to adopt a periodic pole inspection program subsequent to Blood's injury—in urging the jury to award punitive damages. Counsel stated, for example, "[A]s you heard yesterday, [Qwest] continues, even after this happened, continues to refuse to maintain, inspect, repair, [and] replace utility poles in Colorado." He added: "Qwest has continued to engage in the practice of not inspecting, maintaining, and repairing its utility poles on a routine basis." And again: "[Qwest] admit[s], we don't inspect and maintain any of the 157,862 poles we have, and they still don't do it, even today." And again: "If [this witness] was working at Qwest, there would be an inspection program going on today." And again: "[E]ven today, three years after [Blood was injured], [Qwest] still is not out there in-

specting, maintaining, repairing on a regular basis a single pole."

Concluding his closing argument, Blood's counsel told the jury that:

*Nothing tells you more about the purposely-committed conduct than what has happened at Qwest since June 29th, 2004.* Knowing what has happened, hearing all of these witnesses, their own witnesses, Qwest still, today, does not have a program for inspecting, maintaining, and repairing its telephone poles.

Qwest is not listening.... You and only you have the power to make Qwest listen.

Your verdict sends a message.... Your verdict sends a message that says you must pay for what you did and *you must pay some punishment because you continue to do it.* When that message is sent out of this courtroom, within an hour that message is going to be heard at headquarters. That message is going to be read. Those Qwest phones, they're going to be ringing because you have sent a message that no one else can send.

And maybe out of something bad.... There's got to be some good in there, maybe out of something really bad some good can come. And the good is that the poles get repaired, the poles get replaced, there is not another Andy Blood.

And that if sometime in the near future we were to see [a Qwest officer] and we were to say to him ... *do you have an inspection and maintenance and repair program' [He] would look at us and say, Yep, I've got the budget and I've got the instruction.* That's the message that your verdict can send. [Emphasis added.]

The majority finds that defense counsel's singular and repeated focus on Qwest's failure to adopt a post-injury pole inspection program during closing argument was cured

---

1. The majority considers at length the issue of whether the court's oral instruction cured any error caused by counsel's arguments under the rubric of an as-applied challenge, maj. op. at 1088–92, although it then, somewhat inconsistently, suggests that such arguments were not preserved for our review. *Id.* at 1081 n. 4 ("Qwest did not seek certiorari review of the

court of appeals' decision that the trial court did not abuse its discretion in denying the motion for mistrial."). If the court were to hold, as I urge, that the oral instruction did not cure the prejudice caused by counsel's post-accident arguments, a new trial would be required—that is, a mistrial should have been granted.

by the court's oral statement [2] to the jury that it should not consider post-injury evidence in determining whether to award punitive damages. *See* maj. op. at 1079–80, 1087–88. Yet the majority overestimates the effectiveness of the court's oral instruction and underestimates the prejudicial impact that the closing argument would have had on the jury.

First, the trial court's oral instruction to the jury that it should only focus on pre-accident conduct in determining punitive damages would have made little sense to the jury, given that virtually the entirety of Blood's argument for punitive damages was based on Qwest's failure to adopt a pole inspection program after the accident.[3] Indeed, as noted above, Blood's counsel focused almost exclusively on post-accident conduct, stating, *inter alia,* that "Nothing tells you more about the purposely-committed conduct"—that is, conduct that would justify an award of punitive damages—*"than what has happened at Qwest since June 29th, 2004."* (Emphasis added.) The combination of the counsel's singular focus on *post-accident conduct* and the court's admonition to consider only *pre-accident conduct,* in effect, left the jury with nothing on which to base a punitive damages verdict [4]—leading to the strong possibility that the jury would discount the court's oral admonition.

More importantly, the court's oral instruction was inconsistent with the written instruction on punitive damages that the jury had before it. The written instruction on

punitive damages contained no temporal limitation.[5] As a result, the written instruction permitted the jury to consider post-accident conduct. Therefore, when the jury conducted deliberations in the jury room, it had before it no temporal limitation at all in the written instruction, or (at best) an oral temporal limitation that was inconsistent with both the written instruction and counsel's argument for punitive damages. The majority discusses at length, maj. op. at 1088–91, the presumption that jurors are presumed to follow their instructions, but its reliance on that presumption is misplaced. Indeed, it is impossible to determine which instruction—the written instruction or the oral instruction—we should assume the jury followed. In fact, it is more likely that the jury followed the written instruction and applied no temporal limit at all, as it was the written, not the oral, instruction that the jury had before it in the jury room.

Furthermore, the majority underestimates the prejudicial impact of counsel's focus on Qwest's post-accident failure to adopt a pole inspection program. The prejudicial nature of the references is plainly evidenced by the fact that the district court *trebled* the punitive damages award after trial due to Qwest's post-injury conduct. Under section 13–21–102(3)(a), C.R.S. (2010), a district court may "increase any award of exemplary damages, to a sum not to exceed three times the amount of actual damages, if it is shown that ... *[t]he defendant has continued the behavior ...* which is the subject of the claim

---

2. Immediately after Blood's closing, Qwest moved for a mistrial on the grounds the Blood's counsel had improperly argued for punitive damages based on post-accident conduct. The court denied the mistrial but told the jury that "if you were to consider ... punitive damages in this matter ... the only conduct of Qwest that can be considered in relation to punitive damages is the conduct prior to the date of the accident."

3. The majority emphasizes the fact that, after the court's oral instruction to the jury, counsel used the proper date during his rebuttal closing. Maj. op. at 1080, 1091–92. The brief references in rebuttal closing argument to the proper time period, however, are insignificant given the multiple references to Qwest's failure to adopt a post-accident pole inspection program during closing argument.

4. As noted below, the majority suggests that the jury could have based its punitive damages on Qwest's pre-accident conduct. Maj. op. at 1089–90. Yet that is not what Blood's counsel asked the jury to do.

5. Jury Instruction No. 21 states that:

If you find in favor of Andrew Blood, on his claim of negligence, then you shall consider whether the Plaintiff should recover damages against Defendant Qwest. If you find beyond a reasonable doubt that Defendant Qwest acted in a willful and wanton manner, in causing Plaintiff's injuries, damages and losses, you shall determine the amount of punitive damages, if any, that the Plaintiff should recover.

Punitive damages, if awarded, are to punish Defendant Qwest and to serve as an example to others.

against the defendant in a willful and wanton manner ... during the pendency of the case." (Emphasis added.) Here, the district court trebled the amount of punitive damages for "continued behavior" without holding a hearing; in other words, it ordered a trebling of punitive damages based on trial evidence and argument alone.[6] If the district court felt compelled to treble punitive damages based on what it heard at trial about Qwest's post-injury conduct, it is difficult to see how the jury could have ignored such post-injury conduct. Under these circumstances, the district court's oral instruction to the jury that it should consider only conduct up to the injury was ineffective at best.

The majority discounts the prejudicial impact of the post-accident evidence because Qwest had failed to adopt a periodic pole inspection program *prior* to the injury. In other words, in the majority's view, there was plenty of evidence of Qwest's bad conduct prior to the accident to justify the punitive damages award. Maj. op. at 1089–90. Indeed, the majority goes so far as to suggest that its substantive due process review—that is, its conclusion that the $18 million punitive damages award in this case is justified, *id.* at 1092–1100—protects Qwest against procedural error. *Id.* at 1090. But simply because the majority believes that an $18 million punitive damages award is justified by the evidence does not mean that the jury would have arrived at the same award had the procedural error not occurred. Substantive review does not replace procedural review. *See, e.g., State Farm Mut. Auto. Ins. v. Campbell,* 538 U.S. 408, 416, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003) (noting that there are both procedural and substantive due process limitations on punitive damages awards).

Additionally, the majority mistakenly suggests that Qwest was actually better off than it should have been because "it received the benefit of an overly-protective [oral] jury instruction" from the district court. Maj. op. at 1088. According to the majority, the court's oral instruction was "overly-protective" because it did not allow the jury to consider evidence of Qwest's potential harm to nonparties "for the legitimate purpose of assessing the reprehensibility of Qwest's conduct." *Id.; see also id.* at 1088 (referencing "the trial court's overly-protective instruction"); *id.* at 1094 n.16 (same). As a preliminary matter, the majority's "over-protective" description rests entirely on its faulty assumption that the jury would have followed the court's oral admonition in the face of a contradictory written instruction and counsel's singular post-accident focus. But its over-protective description fails on its own accord as well. As noted above, section 13–21–102(3)(a) allows the district court to treble a punitive damages award where "[t]he defendant has continued the behavior" that forms the basis of the claim against it. Post-accident evidence is thus generally inadmissible at trial in Colorado. *Bennett v. Greeley Gas Co.,* 969 P.2d 754, 761 (Colo.App.1998) (the court, but not the jury, is able to consider actions after the wrongful conduct alleged in the claim, *"but only* that behavior during the pendency of the case") (emphasis added). Under the majority's reasoning, however, evidence of post-accident conduct could be used as a basis for the jury's punitive damages award (as long as the jury was instructed to consider the evidence as going toward reprehensibility)[7] *and* be used as a basis for trebling the jury's punitive damages award under section 13–21–102(3)(a). See maj. op. at 1094 n.16. The majority's "over-protective" reasoning thus leads to impermissible dou-

---

**6.** The court of appeals reversed the trebling of damages on the ground that the district court failed to hold a hearing before ruling. *Blood v. Qwest Services Corp.,* 224 P.3d 301, 318 (Colo. App.2009). Blood did not file a cross-petition for certiorari on the hearing question, and therefore the issue is not before us.

**7.** Even if the majority were correct that *Philip Morris* permits, in the abstract, the consideration

of post-accident conduct that poses potential harm to others with regard to assessing reprehensibility, *see* maj. op. at 1091 n. 13, it errs in importing that concept, without analysis, into Colorado's statutory system for assessing punitive damages, which permits the district court to treble the jury's punitive damages award based on post-accident conduct. *See Blood,* 224 P.3d at 319 n. 5 (noting the "unusual" and "unique" nature of Colorado's two-tiered punitive damages statutory scheme).

ble-counting of post-accident evidence, and as such, cannot serve as a basis for affirming the jury's punitive damages award in this case.

Finally, the majority mistakenly suggests that counsel's post-injury focus was not particularly problematic because Qwest had "opened the door" to consideration of post-injury evidence by exploring with a witness the contractual relationship between Qwest and Xcel. Maj. op. at 1091 ("Blood's closing argument regarding Qwest's post-accident conduct was consistent with the trial court's ruling that Qwest had opened the door to this evidence."). However, the trial court was careful to narrowly cabin its modification of its ruling on the motion in limine. The trial court stated that, "I did allow some limited inquiry [into post-injury conduct] because I found [Qwest] opened the door as to the inquiry concerning the fact that Public Service was still paying rent and Qwest was still receiving rent subsequent to 2004" in accordance with the contract between Quest and Xcel, "[a]nd there was, I think, a question or two along those lines." However, it stated that although it had permitted "a question or two along those lines," post-injury conduct was "not appropriate to be considered for punitive damages and I'll so instruct the jury. I don't think that's an appropriate comment to be made." Therefore, while the district court found that Qwest had opened the door to a limited inquiry into post-injury conduct for purposes of determining the contractual relationship between Qwest and Xcel, the court rejected the opening-the-door theory as it applied to punitive damages. Thus, while the majority and the court of appeals correctly point out that counsel's arguments "were consistent" with the court's admission of post-injury evidence for the limited purpose of exploring the contract question, *see* maj. op. at 1091; *Blood,* 224 P.3d at 321, that fact simply demonstrates that, as the district court concluded, counsel had strayed out of the permissible contractual context into the impermissible punitive damages arena. *See Blood,* 224 P.3d at 333 (Richman, J., dissenting) (concluding that the opening of the door theory "goes only so far"). As such, the opening-the-door theory merely reinforces the conclusion that counsel

made impermissible arguments that had a significant impact on the jury.

In sum, given the trial court's recognition that counsel's arguments had gone far beyond the context in which the post-injury evidence had been properly admitted—coupled with the fact that the written instruction contained no temporal limitation and therefore conflicted with the oral instruction—there is no assurance that the jury's punitive damages award was not based on post-accident conduct. The jury's punitive damages award therefore must be set aside. Accordingly, I respectfully dissent from the majority's opinion.

I am authorized to say that JUSTICE RICE joins in this dissent.